PER CURIAM.
Lionel Michael Miller seeks review of the judgment of conviction and sentence of death entered for the first-degree murder of Jerry Smith. He also appeals his sentences and convictions for the attempted first-degree murder of Larry Haydon, burglary of a dwelling with a battery therein, and attempted robbery with a deadly weapon. Pursuant to our mandatory jurisdiction to review final judgments entered in capital proceedings, we affirm Miller’s convictions and sentences. See art. V, § 3(b)(1), Fla. Const.
FACTS AND PROCEDURAL HISTORY
The evidence presented during the trial revealed that on April 14, 2006, Miller *210 requested the assistance of his roommate to locate the mailman in Miller’s former neighborhood. Miller was attempting to intercept his employment check, which had been mailed to his prior address where he no longer had access to the mailbox. During this excursion, Miller and his roommate drove through Delaney Park in Orlando and observed 72-year-old Jerry Smith standing in her front yard.
Miller stopped and inquired of Smith as to whether the mail had been delivered to her residence that day. Smith was friendly and spoke with Miller for approximately thirty minutes. During this discussion, Miller noticed that Smith experienced memory lapses because she repeated the same story several times. During trial, the medical examiner testified that Smith suffered from Alzheimer’s dementia, which caused her to easily forget things and repeat herself during conversations.
While conversing with Smith, Miller also noticed her jewelry. After the conversation concluded and the men drove away, Miller noted that Smith would be an easy target for a robbery because of her memory lapses. Miller solicited the assistance of his roommate in a plan to rob Smith, but his roommate would not join in the crime. The men eventually acquired Miller’s check and spent the money on drugs and alcohol. During the next two days, Miller repeatedly asked his roommate to transport him to the Smith residence, but the roommate avoided Miller and continued to refuse to join the crime.
On April 16, 2006, which was Easter Sunday, after being with her family during the day, at approximately 7:45 p.m., a neighbor observed that Smith had returned home and was seated on her front porch. While Smith was sitting on her porch, Miller arrived after walking approximately five miles to her residence. Unknown to Smith, Miller had smoked crack cocaine while he walked and carried a filet knife. Smith invited Miller inside and provided him with a glass of water. Miller left the plastic cup on a table, and his fingerprints were later identified on the cup.
Initially, Smith removed an embroidered jacket she was wearing and placed it on a chair in the front room. While in the living room, the two chatted about Smith’s travels to Key West until Smith became concerned. At that point, Smith opened the blinds on her front window but Miller then threw her on the couch and attempted to steal her jewelry. As Smith screamed and resisted, Miller attempted to prevent her screams by covering her mouth with his hand.
As the struggle ensued, Larry Haydon was in the area walking his dog when he noticed that Smith’s blinds were open, and through the window he observed a man, whom he identified as Miller during trial, struggling with Smith inside her home. Haydon heard Smith scream and cry out, “Leave me alone.” In response to this distress, Haydon approached the house. Miller called through the window that there was no problem inside the house, but Haydon proceeded to open the unlocked front door.
Miller stated that he was frightened by both the thought of returning to prison and the screams as Haydon was approaching. As Haydon entered the house, Miller retrieved the filet knife from the back of his pants and stabbed Haydon below his rib cage. While Haydon and Miller were struggling in the living room, Smith escaped into the backyard. Upon observing the escape, Miller disengaged from Hay-don and followed Smith into the backyard.
When Smith saw that Miller had followed her, she again began to scream. Miller could hear neighbors talking, and *211 ordered Smith to be quiet, but she continued to scream. Miller admitted that he was high on crack cocaine and the screaming was “driving [him] crazy.” He “just lost it” and stabbed Smith three times. Upon being stabbed, Smith first fell to the ground momentarily but then regained her footing and ran along the side of her house to the front yard.
After Smith had escaped from the backyard, Miller entered the house again. When he realized that he had cut himself during the altercation, Miller retrieved Smith’s embroidered jacket from a chair in the front room to use as a bandage before escaping through the back door. As he ran from the Smith residence, Miller discarded the knife in the bushes of a nearby house. The knife was recovered later, and ultimately Miller’s DNA was identified on the knife.
As Miller left the scene, a neighbor heard screaming and observed Haydon run to the home beside the Smith residence. The neighbor then saw Smith emerge from the backyard screaming for help. Smith informed the neighbor that a man had broken into her house. Both Haydon and Smith, covered in blood, sought refuge in the residence next door. After contacting emergency services, both Haydon and Smith were transported to the hospital. Haydon survived, but Smith died in the hospital after undergoing emergency surgery.
As he escaped, Miller crossed Delaney Park, which was approximately one block from the Smith residence. Between 8 and 8:15 p.m., a witness observed an anxious and disheveled man walking strangely across Delaney Park holding his right side. Miller confessed that he discarded the knife sheath on a bench as he walked through the park which the police later recovered from the location Miller described.
Later that evening, Miller arrived unexpectedly at an acquaintance’s house, which was located less than a mile from the Smith residence. The acquaintance was asleep, so Miller waited in a chair on the back patio. While he waited, Miller cut the arm off the jacket he had taken from the Smith residence to fashion into a bandage.
At approximately 8:30 p.m., the acquaintance discovered Miller on the porch and allowed him to use the phone to contact his roommate for a ride home. He requested his roommate to bring him a clean shirt to replace the shirt he was wearing. Before the roommate arrived, Miller asked the acquaintance to loan him gas money and requested bandages for his arm. Miller discarded the white jacket that he had used as a bandage which was later recovered from the porch and identified as the jacket Smith had been wearing on the day of the murder.
Shortly after the phone call, the roommate arrived and the pair departed. During the drive home, Miller informed his roommate of the stabbing and commented that anything that could have gone wrong did go wrong. He also stated that a man had “tried to be a hero,” but that “his hero days were over.” Miller admitted he was worried that both Smith and Haydon were dead.
After reading a description of Miller in the newspaper on April 18, 2006, the acquaintance called a crime hotline and informed them that Miller was a possible suspect. Based on this tip, Miller was arrested the following day and transported to the Orlando Police Station.
After Miller was advised of his legal rights he proceeded to confess to stabbing' Smith and Haydon. He informed law enforcement where the knife and sheath were discarded, and identified a picture of *212 Jerry Smith as the victim. When arrested, Miller was wearing the same jeans he had worn during the murder. Blood was found on the jeans and DNA analysis disclosed that some of the blood matched Miller’s while two other blood samples revealed the DNA of another who could not be precisely identified.
At some point during the struggle with Smith or Haydon, Miller had dropped a pipe that he admitted he had utilized to smoke crack cocaine. The crime scene technicians recovered the pipe from the floor of the Smith residence, and later analysis revealed that the pipe contained Miller’s DNA. Moreover, blood from both Haydon and Miller was found in Smith’s house.
The jury found Miller guilty as to each count. During the penalty phase, the medical examiner testified that Smith suffered from Alzheimer’s dementia, and identified the cause of death as multiple stab wounds. The medical examiner also testified that Smith was conscious during and after the attack and likely felt great pain.
The State presented the testimony of Miller’s parole officer in Oregon, who stated that Miller was currently on parole for armed robbery and had failed to attend his parole meetings. The State also presented the testimony of several witnesses to establish the underlying details of Miller’s prior armed robbery and manslaughter convictions.
Miller presented the testimony of an investigator who conducted a family background investigation on Miller. In addition, Miller presented a psychologist who testified with regard to Miller’s family background and substance abuse history. The psychologist diagnosed Miller as having an antisocial personality disorder. In rebuttal, the State presented the testimony of a psychiatrist who also diagnosed Miller as having an antisocial personality disorder in conjunction with polysubstance dependence and dysthymia, which is a long-term, low-level syndrome of depression. The jury recommended a death sentence for the murder of Jerry Smith by a vote of eleven to one. The trial court held a Spencer[1] hearing where Miller presented documentation of his military service.
The trial court followed the jury’s recommendation and imposed a sentence of death. In sentencing Miller to death, the trial court found the following five aggravating circumstances, each of which it gave great weight: (1) the capital felony was committed by a person previously convicted of a felony and under a sentence of imprisonment (parole); (2) the defendant was previously convicted of a felony involving the use or threat of violence to the person; (3) the capital felony was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit the crime of robbery or burglary; (4) the capital felony was especially heinous, atrocious, and cruel (HAC); and (5) the victim of the capital felony was particularly vulnerable due to advanced age or disability. The trial court found no statutory mitigation, but found six nonstat-utory mitigating circumstances as follows: (1) dysfunctional family (some weight); (2) prior military service (very little weight); (3) cooperation with law enforcement (little weight); (4) remorse (very little weight); (5) antisocial personality disorder (little weight); and (6) long history of substance abuse (some weight).
On appeal, Miller presents six issues for review in addition to this Court’s independent duty to determine the sufficiency of *213 the evidence and proportionality of the sentence.
ANALYSIS
Death Qualification of Juror
Miller first maintains that the trial court committed reversible error in excusing juror 407 for cause after the juror indicated that he could not impose the death penalty for a capital offense which did not involve genocide or mass murder. After reviewing the responses of juror 407 during voir dire, we conclude that the trial court acted within its discretion in excusing the juror for cause.
A potential juror may be excused for cause if the “juror has a state of mind regarding ... the case ... that will prevent the juror from acting with impartiality.” § 913.03(10), Fla. Stat. (2006). The United States Supreme Court articulated the standard for determining when a prospective juror may be excused for cause because of personal views on capital punishment as “whether the juror’s views would ‘prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’ ” Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). In a capital proceeding, a juror is unqualified based on personal views if the juror expresses an unyielding conviction and rigidity toward the death penalty. See Barnhill v. State, 834 So.2d 836, 844 (Fla.2002) (citing Farina v. State, 680 So.2d 392 (Fla.1996)). However, there is no requirement that a court find a juror qualified if he “might vote for death under certain personal standards.” Witt, 469 U.S. at 422, 105 S.Ct. 844.
It is within the province of the trial court to determine whether a challenge for cause is proper. Therefore, this Court gives deference to a trial court’s determination of a prospective juror’s competency and will not overturn that determination absent manifest error. See Fernandez v. State, 730 So.2d 277, 281 (Fla.1999) (citing Mendoza v. State, 700 So.2d 670, 675 (Fla.1997)); Castro v. State, 644 So.2d 987, 989 (Fla.1994) (citing Witt, 469 U.S. at 426, 105 S.Ct. 844) (applying abuse of discretion standard to juror qualification challenges).
Viewing the entire context of the voir dire, the trial court did not abuse its discretion in excusing the prospective juror. The juror was properly excused for cause in accordance with the standards articulated by the United States Supreme Court in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), because the juror demonstrated that he would vote against the death penalty regardless of the facts presented or instructions given. See, e.g., Jackson v. State, 366 So.2d 752, 755 (Fla.1978) (discussing application of Witherspoon standards in Florida). As directed in Williams v. State, 228 So.2d 377 (Fla.1969):
“The most that can be demanded of a venireman ... is that he be willing to consider all of the penalties provided by state law....” [Witherspoon,] 391 U.S. at 522[, 88 S.Ct. 1770]. If, upon questioning, the prospective juror says he doesn’t know whether he can vote for conviction if it might mean the electric chair, then the State cannot determine his willingness to consider all penalties, nor can it determine whether or not the venireman’s attitude toward the death penalty would prevent him from making an impartial decision as to guilt.
Id. at 381. Furthermore, it is proper to exclude prospective jurors who “state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant’s *214 guilt .... (or) who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them.” Witt v. State, 342 So.2d 497, 499 (Fla.1977) (quoting Witherspoon, 391 U.S. at 513-14, 88 S.Ct. 1770).
Upon first being questioned with regard to the death penalty, juror 407 revealed that he did not “believe in it.” When further asked if he could consider the imposition of the death penalty, juror 407 answered, “[I]t would be hard for me to do that.” He next responded that even if the facts and circumstances of the case under the law would warrant a sentence of death, “it would be very difficult for [him] to do that,” and that he did not think he could impose the death penalty. He further stated that he could not envision any circumstances under which he could vote to impose a sentence of death. In response to the trial court’s inquiry whether he could consider both punishments equally and follow the law instead of his own personal opinion in making a recommendation, juror 407 stated, “I really don’t think I could vote for the death penalty.” These statements express an unyielding conviction and rigidity toward the death penalty that would substantially impair the performance of the juror’s duties in accordance with the court’s instructions and the juror’s oath. See Barnhill, 834 So.2d at 844; Hertz v. State, 803 So.2d 629, 638 (Fla.2001).
The statements of this juror that he could “envision” the death penalty in circumstances involving mass murder or genocide did not alter the unyielding conviction he expressed toward capital punishment. It is clear that while he might support a death sentence in the very limited circumstance of genocide or mass murder, he would not vote to impose the death penalty for any other type of murder. In Conde v. State, 860 So.2d 930 (Fla.2003), we upheld the decision of the trial court to excuse a juror for cause where the juror initially stated that she did not support the death penalty and repeatedly expressed significant doubt as to whether she would ever be able to recommend the death penalty even though she later said that she might consider the death penalty after defense counsel provided extreme examples, such as the torture and mutilation of a small child. See id. at 942-43; see also Morrison v. State, 818 So.2d 432, 442 (Fla.2002) (affirming excusal of juror who stated he was not sure he could follow the law and impose the death penalty but expressed a belief in capital punishment in the limited circumstance when a person “was in my home, [and] killed my children”); Hartley v. State, 686 So.2d 1316, 1322 (Fla.1996) (affirming for cause challenge where juror stated that there were very few, if any, situations in which he would recommend the death penalty). Similar to Conde, Morrison, and Hartley, the answers of juror 407 here indicated that his overall views on capital punishment would “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” Witt, 342 So.2d at 499.
In this case, the prospective juror made it clear that his personal beliefs would prevent him from impartially following the law. Therefore, the trial court did not abuse its discretion in excusing the juror for cause because the statements of the juror constituted sufficient justification for this decision.
Constitutionality of Florida’s Capital Sentencing Scheme
Miller asserts that Florida’s capital sentencing scheme requires findings of “sufficient aggravating circumstances” and “in *215 sufficient mitigating circumstances,” and that those facts must be alleged in the indictment and unanimously found to exist beyond a reasonable doubt by a twelve-person jury to satisfy constitutional standards. We review a trial court’s ruling on the constitutionality of a Florida statute de novo. See Simmons v. State, 944 So.2d 317, 323 (Fla.2006). After a thorough consideration of the constitutional challenges presented by Miller, we deny relief on this issue.

Indictment

Miller first contends that under Florida law and Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),[2] an indictment must allege the required factual findings in support of a death sentence, which are stated in section 921.141(3). He bases this assertion on the premise that the indictment must contain an allegation of every essential element of the crime to be punished, and that under Apprendi, this includes the factual findings the trial court must make during the penalty phase of Florida’s bifurcated capital proceedings. Specifically, Miller maintains that the indictment must expressly contain the statutory language of section 921.141(3), which provides:
(3) Findings in support of sentence of death.—Notwithstanding the recommendation of a majority of the jury, the court, after weighing the aggravating and mitigating circumstances, shall enter a sentence of life imprisonment or death, but if the court imposes a sentence of death, it shall set forth in writing its findings upon which the sentence of death is based as to the facts:
(a) That sufficient aggravating circumstances exist as enumerated in subsection (5), and
(b) That there are insufficient mitigating circumstances to outweigh the aggravating circumstances.
Miller contends that because these are the respective findings of fact necessary for the imposition of the death sentence, Ap-prendi requires them to be alleged in the indictment.
We find no merit to this argument. Florida’s capital sentencing scheme withstands constitutional scrutiny because it provides sufficient notice of the charges against the accused. The purpose of an indictment is to provide the accused with sufficient notice of the nature and cause of the offense charged. See art. I, § 16, Fla. Const.[3] For a charging document “to sufficiently charge a crime it must follow the statute, clearly charge each of the essential elements, and sufficiently advise the accused of the specific crime with which he is charged.” Price v. State, 995 So.2d 401, 404 (Fla.2008). Therefore, procedural due process is afforded when an accused receives sufficient notice of these allegations.
An indictment that charges first-degree murder immediately places a defendant on notice that he or she is charged with a capital felony punishable as provided by the statute. See Sireci v. State, 399 So.2d 964, 970 (Fla.1981), overruled on other grounds by Pope v. State, 441 So.2d 1073, 1077-78 (Fla.1983). In Sireci we held that section 921.141(5) specifically defines the aggravating circumstances that *216 may be considered by the judge and the jury, thereby rebutting any contention that a defendant lacked notice of the aggravating circumstances on which the State would rely. Applying this reasoning in Hitchcock v. State, 413 So.2d 741 (Fla.1982), we concluded that because “[t]he statutory language [of section 921.141(5) ] limits aggravating factors to those listed, ... there is no reason to require the state to notify defendants of the aggravating factors that the state intends to prove.” Id. at 746 (citations omitted); see also Cox v. State, 819 So.2d 705, 725 (Fla.2002); Mann v. Moore, 794 So.2d 595, 599 (Fla.2001); Vining v. State, 637 So.2d 921, 927 (Fla.1994); Medina v. State, 466 So.2d 1046, 1048 n. 2 (Fla.1985); Tafero v. State, 403 So.2d 355, 361 (Fla.1981); Menendez v. State, 368 So.2d 1278, 1282 n. 21 (Fla.1979) (citing Spinkellink v. Wainwright, 578 F.2d 582, 609 (5th Cir.1978)).
After Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), we reaffirmed this principle in Kormondy v. State, 845 So.2d 41 (Fla.2003), and held that “Ring does not require ... notice of the aggravating factors that the State will present at sentencing.” Kormondy, 845 So.2d at 54; see also Grim v. State, 971 So.2d 85, 103 (Fla.2007); Coday v. State, 946 So.2d 988, 1006 (Fla.2006); Ibar v. State, 938 So.2d 451, 473 (Fla.2006); Winkles v. State, 894 So.2d 842, 846 (Fla.2005); Hodges v. State, 885 So.2d 338, 359 nn. 9-10 (Fla.2004); Blackwelder v. State, 851 So.2d 650, 654 (Fla.2003); Lynch v. State, 841 So.2d 362, 378 (Fla.2003); Porter v. Crosby, 840 So.2d 981, 986 (Fla.2003).
Miller contends that his constitutional challenge differs from the challenges we previously rejected because it is based on inclusion in the indictment of the findings of fact required under section 921.141(3), rather than the aggravating circumstances provided in section 921.141(5). This distinction, however, does not alter the constitutional analysis of a challenge to an indictment or the result of that analysis. Like the potential aggravating circumstances, the weighing process that must be performed by the trial judge when considering whether to impose a death sentence is also articulated in the Florida Statutes. See § 921.141(3), Fla. Stat. (2005). A defendant charged by indictment with first-degree murder is on notice that he or she is accused of a capital offense which is punishable as provided by statute, which necessarily includes section 921.141(5). Therefore, the indictment is not required to express this specific statutory language because the statute affords sufficient notice to satisfy due process.
Similarly, Miller cannot demonstrate actual prejudice. “Generally the test for granting relief based on a defect in the information is actual prejudice to the fairness of the trial.” Price, 995 So.2d at 404; see Fla.R.Crim. Proc. 3.140(o).[4] Moreover, we have expressed that courts should uphold charging documents “if they are in substantial compliance with the statutory requirements.” Price, 995 So.2d at 405; see also DuBoise v. State, 520 So.2d 260, 265 (Fla.1988) (holding that when a charging document references a specific *217 section of the criminal code which sufficiently details all the elements of the offense, the State’s failure to include an element of a crime does not automatically render an information so defective that it will not support a judgment of conviction). The instant indictment adequately placed Miller on notice of the specific crime with which he was charged and the findings specified in section 921.141(3). He was also provided with notice of the aggravating circumstances that the State sought to prove. Furthermore, there is nothing in the record to indicate that Miller was misled as to what he was charged with, or that he was embarrassed in the preparation of his defense. See Fla. R.Grim. P. 3.140(o). Nor does the record indicate that Miller was exposed after conviction to substantial danger of a new prosecution for the same offense. See id. Therefore, the indictment must be upheld because Miller cannot demonstrate actual prejudice.
Lastly, Miller asserts that a constitutional implementation of our capital sentencing statute would require the indictment to include the allegations that “sufficient aggravating circumstances exist as enumerated in subsection (5),” and that “there are insufficient mitigating circumstances to outweigh the aggravating circumstances.” § 921.141(3) (emphasis supplied). This interpretation elevates form over substance in contradiction to the nature of the grand jury. If this express statutory language were included in an indictment, a grand jury would have to find that sufficient evidence of these allegations existed. See Fla. Std. Jury Instr. (Grand Jury) 2.1, 2.4. This is a misdirected interpretation of the capital sentencing statute. A grand jury session is an ex parte proceeding which usually does not consider both sides of an issue. See Fla. Std. Jury Inst. (Grand Jury) 2.3. The function of the grand jury is to obtain evidence as to a charge of crime, by the State, and to determine whether the person so charged should be brought to trial. See id. Generally, the defendant is not even present unless testifying as a witness. See § 905.17(1), Fla.'Stat. (2005).[5] The State presents witnesses and evidence, whereas the defendant is not afforded that opportunity. See § 905.19, Fla. Stat. (2005).
Given that the defendant is not present or represented by counsel during the grand jury proceeding, Miller’s contention would require the State to present evidence that there are insufficient mitigating circumstances. This is contrary to the operation of our criminal system. We have discussed the countervailing relationship of aggravating and mitigating circumstances, as follows:
We note substantive differences, however, between proving aggravating circumstances and proving mitigators. To obtain a death sentence, the State must prove beyond a reasonable doubt at least one aggravating circumstance, whereas to obtain a life sentence the defendant need not prove any mitigating circumstances at all. Moreover, the defendant may invoke “[t]he existence of any other factors in the defendant’s background that would mitigate against the imposition of the death penalty.” The State, on the other hand, is limited to the specific aggravating factors listed in section 921.141(5). Therefore, even if it could be required, pretrial notice of *218 specific nonstatutory mitigation could prove unwieldy.
State v. Steele, 921 So.2d 538, 543-44 (Fla.2005) (citations omitted) (quoting § 921.141(6)(h), Fla. Stat. (2004)). The State cannot refute information that is exclusively within the possession of the defendant. Accordingly, it would be illogical to require the State to demonstrate that “there are insufficient mitigating circumstances to outweigh the aggravating circumstances” at that stage of the proceeding, which would be necessary if we were we to adopt the position maintained by Miller. § 921.141(3).
Therefore, for the reasons expressed above, we deny relief on this issue.

Unanimous Jury Finding of Sufficient Aggravating Circumstances and Insufficient Mitigating Circumstances

Next, Miller contends that Ap-prendi requires that a unanimous twelve-person jury make the findings of fact necessary to determine eligibility for the death penalty. In his view, these findings are specified in section 921.141(3); therefore, a constitutional interpretation of Florida’s capital sentencing scheme requires the jury to unanimously determine that sufficient aggravating circumstances exist and that insufficient mitigating circumstances exist to outweigh the aggravating circumstances.
Miller’s argument cannot prevail under the factual circumstances of this case. Even if this Court were to determine that the statute requires a unanimous jury to conduct the findings of fact articulated in section 921.141(3), the death sentence in this case satisfies Miller’s interpretation of the application of Apprendi in Florida. The twelve-person, guilt-phase jury unanimously found that Miller had committed the violent felonies of attempted first-degree murder of Larry Haydon, burglary of a dwelling with a deadly weapon, and attempted robbery with a deadly weapon. These violent felonies established a unanimous jury finding of two aggravating circumstances — (1) the defendant was previously convicted of a felony involving the use or threat of violence to a person, and (2) the capital felony was committed while the defendant was engaged in the commission of, attempt to commit, or flight after committing the crime of robbery or burglary.
In addition, this Court has repeatedly held that where a death sentence is supported by the prior violent felony aggravating circumstance, Florida’s capital sentencing scheme does not violate Ring or Apprendi See, e.g., Frances v. State, 970 So.2d 806, 822 (Fla.2007) (citing Apprendi, 530 U.S. at 490, 120 S.Ct. 2348); Jones v. State, 855 So.2d 611, 619 (Fla.2003). The State introduced Miller’s prior convictions from Oregon for first-degree manslaughter and robbery in the first degree, with corresponding evidence that established the violent nature of these felonies. Furthermore, Miller was also on parole for the first-degree robbery, which supported the aggravating circumstance that the capital felony was committed by a person previously convicted of a felony and under a sentence of imprisonment. Also, as discussed above, a Florida jury unanimously found Miller guilty of three violent felonies. Therefore, the trial court found that the death sentence was supported by the prior violent felony aggravating circumstance, which satisfies express exemptions to Apprendi that were unaltered by Ring.
In sum, Miller’s prior and contemporaneous violent felonies established three aggravating circumstances — (1) the capital felony was committed by a person previously convicted of a felony and under a sentence of imprisonment (parole); (2) the defendant was previously convicted of a felony involving the use or threat of vio *219 lence to the person; (3) the capital felony was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit the crime of robbery or burglary. Therefore, Miller’s contention that a unanimous jury did not find sufficient aggravating circumstances is unavailing because several aggravating circumstances stemmed from his prior and contemporaneous violent felonies.
Lastly, this Court has repeatedly rejected the assertion that Apprendi and Ring require that aggravating and mitigating circumstances be found individually by an unanimous jury. See, e.g., Frances, 970 So.2d at 822; Rodgers v. State, 948 So.2d 655, 673 (Fla.2006); Hernandez-Alberto v. State, 889 So.2d 721, 733 (Fla.2004). Miller’s attempt to distinguish his argument from those previously rejected by this Court is attenuated and unpersuasive. Under Florida’s bifurcated capital proceeding, the jury considers the sufficiency of the aggravators and the insufficiency of the mitigating circumstances when issuing an advisory sentence under section 921.141(2). The plain language of section 921.141(3) refers to the duty of the trial court with regard to the required mitten findings for imposing a death sentence. Miller has failed to provide a persuasive argument in support of the penalty phase jury making findings with regard to the trial court’s weighing process specified in section 921.141(3). Accordingly, we deny relief on this issue.

Separation of Powers

Miller also asserts that this Court is violating the constitutional doctrine of separation of powers by not requiring a jury to make the findings specified in section 921.141(3), and by holding that only one aggravating circumstance is “sufficient” to justify imposition of the death penalty in contradiction to the statute’s unambiguous use of the plural term “circumstances.” In State v. Dixon, 283 So.2d 1 (Fla.1973), this Court interpreted the term “sufficient aggravating circumstances” in Florida’s capital sentencing scheme to mean one or more such circumstances. See id. at 9 (“When one or more of the aggravating circumstances is found, death is presumed to be the proper sentence unless it or they are overridden by one or more of the mitigating circumstances.... ”). This Court has explained that “[t]he Legislature is presumed to know the judicial constructions of a law when amending that law, and the Legislature is presumed to have adopted prior judicial constructions of a law unless a contrary intention is expressed.” Fla. Dep’t of Children & Families v. F.L., 880 So.2d 602, 609 (Fla.2004) (emphasis supplied). Since Dixon, the Legislature has not amended the Florida Statutes to provide that at least two aggravating circumstances must be found to impose a sentence of death. Therefore, it can be presumed that the Legislature agrees with and has adopted the Dixon Court’s interpretation of the term “sufficient aggravating circumstances.” Furthermore, under the facts of this case a unanimous jury found sufficient aggravating circumstances, as discussed above. Accordingly, Miller’s separation of powers challenge lacks merit.
In conclusion, Miller has not established any basis on which this Court should reconsider the established points of law with regard to Florida’s capital sentencing scheme. Accordingly, we deny relief on this issue.
Motion to Suppress
Next, Miller contends that the trial court erred in denying his motion to suppress his confession because the Mi *220 randa[6] warnings failed to advise him that he had the right to free appointed counsel during questioning. “To be held admissible, the confessions must pass muster under both the state and federal constitutions .... [W]e examine the confessions initially under our state Constitution; only if they pass muster here need we re-examine them under federal law.” Traylor v. State, 596 So.2d 957, 961-62 (Fla.1992) (“In any given state, the federal Constitution thus represents the floor for basic freedoms; the state constitution, the ceiling.”). This Court has explained the standard of review for an order on a motion to suppress:
[A]ppellate courts should continue to accord a presumption of correctness to the trial court’s rulings on motions to suppress with regard to the trial court’s determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution.
Connor v. State, 803 So.2d 598, 608 (Fla.2001). In addition, the State bears the burden to establish by a preponderance of the evidence that the confession was freely and voluntarily given. See DeConingh v. State, 433 So.2d 501, 503 (Fla.1983).
Following his arrest, law enforcement escorted Miller to police headquarters. Prior to being placed in an interrogation room, Miller informed law enforcement that he wanted to talk to the police for the first time in his life and asked if he could have a single jail cell and his cellular phone. After he was placed in a room, a law enforcement officer read Miller his Miranda rights from a standard card used by the Orlando Police Department. Although the warnings were not recorded, the detectives made reference to them at the beginning of the taped interrogation. During the suppression hearing, the officer read the following statements from the card:
You have the right to remain silent. Do you understand? Anything you say may be used against you in court. Do you understand? You have the right to talk to a lawyer before OMd dunng questioning. Do you understand? If you cannot afford a lawyer and want one, one will be provided for you before questioning without charge. Do you understand? Has anyone threatened you or promised you anything to get you to talk to me?
(Emphasis supplied.) Miller waived all of these rights after he affirmed that he understood them. He did not request to speak to an attorney at any point during the interview. In addition, Miller chose not to attend or testify during the suppression hearing.
For the reasons that follow, we hold that the trial court did not err in denying Miller’s motion to suppress, because the Miranda warning given sufficiently conveyed his rights under the constitutions of Florida and the United States. Specifically, the warnings given to Miller satisfy the requirements of State v. Powell, 998 So.2d 531 (Fla.2008), rev’d on other grounds, — U.S. -, 130 S.Ct. 1195, — L.Ed.2d - (2010), and do not constitute a narrower and less functional warning than that required by Miranda.
To ensure the voluntariness of a confession, one charged with a crime must be informed of his or her rights prior to a custodial interrogation. See Traylor, 596 So.2d at 964. Both article I, section 9 of *221 the Florida Constitution and the Fifth Amendment to the United States Constitution provide that in any criminal case, no person shall be compelled to be a witness against him- or herself. In addition, in all criminal prosecutions the accused is guaranteed the right to the assistance of counsel under article I, section 16 of the Florida Constitution and the Sixth Amendment to the United States Constitution. In conjunction, these constitutional provisions guarantee that a suspect in Florida has a right to consult with a lawyer before questioning and to have that lawyer present during a custodial interrogation. Furthermore, free counsel will be appointed if the accused cannot afford to obtain his or her own counsel.
Notwithstanding the incorrect statements in our colleague’s concurring in result opinion without supporting legal authority, Florida law has long recognized a concern with coerced confessions and therefore provided protections under our state constitution to ensure the voluntariness of these statements. See Traylor, 596 So.2d at 963-966 (discussing the foundation provided by Florida’s Declaration of Rights and the protections afforded under Florida law for more than a century and a half). “To ensure voluntariness, we traditionally have required as a matter of state law that one charged with a crime be informed of his rights prior to rendering a confession.” Id. at 964 (emphasis supplied). Based on this Court’s analysis of Florida law and the “experience under Miranda and its progeny,” we outlined the following rights that police officers must convey to a Florida suspect prior to a custodial interrogation to ensure the volun-tariness of a confession:
[1] they have a right to remain silent, [2] that anything they say will be used against-them in court, [3] that they have a right to a lawyer’s help, and [4] that if they cannot pay for a lawyer one will be appointed to help them.
Traylor, 596 So.2d at 966 (footnote omitted). In Traylor, this Court expressly defined the right to have the help of a lawyer to mean “that the suspect has the right to consult with a lawyer before being interrogated and to have the lawyer present during interrogation.” Id. at 966 n. 13 (emphasis supplied). “A prime purpose of the above safeguards is to maintain a bright-line standard for police interrogation; any statement obtained in contravention of these guidelines violates the Florida Constitution and may not be used by the State.” Id.
In delineating these rights, we noted that in Miranda, “the federal Court established procedural safeguards similar to those defined above in order to ensure the voluntariness of statements rendered during custodial interrogation.” Traylor, 596 So.2d at 965 n. 12. The four procedural warnings provided by the United States Supreme Court in Miranda encompassed the following:
He must be warned prior to any questioning that [1] he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.
384 U.S. at 479, 86 S.Ct. 1602 (emphasis supplied).
After Miranda, this Court and the United States Supreme Court have stressed that there is no talismanic incantation required to ensure the warnings are sufficiently conveyed. See Anderson v. State, 863 So.2d 169, 182 (Fla.2003) (“Although Miranda warnings must be given to suspects before custodial interrogation can begin, there is no talismanic fashion in *222 which they must be read or a prescribed formula that they must follow, as long as the warnings are not misleading.”); see also California v. Prysock, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981). The High Court further stated that the examination of a Miranda warning should not be done as if “construing a will” or “defining the terms of an easement.” Duckworth v. Eagan, 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989). Instead, “[t]he inquiry is simply whether the warnings reasonably ‘conve[y] to [a suspect] his rights as required by Miranda.’ ” Id. (quoting Prysock, 453 U.S. at 361, 101 S.Ct. 2806). The United States Court of Appeals for the Tenth Circuit has elaborated on the general scope of Miranda, stating that “[t]he crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights.” Coyote v. United States, 380 F.2d 305, 308 (10th Cir.1967).
Neither this Court nor the United States Supreme Court has mandated that, once properly advised on the right to the presence of an attorney, a suspect must be again advised that the right to appointed counsel is available before and during questioning. This Court’s decision in Powell does not support Miller’s position. First, Powell is limited to the warnings with regard to the right to the presence of counsel. In holding that a suspect must be advised that he may consult with counsel before and during questioning, we considered the express statements in Traylor that under the Florida Constitution, the right to have a lawyer’s help means that “the suspect has the right to consult with a lawyer before being interrogated and to have the lawyer present during interrogation.” Powell, 998 So.2d at 535 n. 2 (emphasis supplied) (quoting Traylor, 596 So.2d at 966 n. 13). Nothing in Traylor or Powell mandates the result sought by Miller.
Here, Miller asserts that under Powell, he was given a narrower and less functional warning than that required by Miranda because he was not advised of the right to appointed counsel both before and during the interrogation. Foremost, Powell does not dictate the result desired by Miller. Under Traylor and Powell, a suspect need only be advised that he has the right to have counsel appointed before questioning and that once appointed, the suspect has the right to consult with that counsel before being interrogated and to have counsel present during questioning. Once a suspect is properly advised of his right to the presence of counsel before and during the interrogation, there is no requirement that the suspect again be additionally advised that he has the right to have counsel appointed during questioning.
Next, Miranda explicitly states that the defendant should be informed that he has a right to appointed counsel prior to questioning. See Miranda, 384 U.S. at 478, 86 S.Ct. 1602. In Miranda, the suspect “was not in any way apprised of his right to consult with an attorney and to have one present during the interrogation,” id. at 492, 86 S.Ct. 1602 (emphasis supplied), and the Supreme Court held that the “right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege.” Id. at 469, 86 S.Ct. 1602 (emphasis supplied). The Miranda Court did not emphasize a similar temporal requirement for a statement of the right to appointed counsel. In fact, the terminology articulated in Miranda with regard to the right to appointed counsel includes the temporal qualification “pri- or to any questioning.” Id. at 444, 479, 86 S.Ct. 1602. Although the United States Supreme Court has said that the warnings need not be a “virtual incantation of the *223 precise language contained in the Miranda opinion,” Prysock, 453 U.S. at 355, 101 S.Ct. 2806, the warning provided to Miller merely substituted the synonym “before” for “prior to.” Thus, under the very language provided by the Miranda Court, the terminology of the warnings given to Miller mirrored the procedural safeguards outlined in Miranda.
Furthermore, the relevant inquiry is whether the warnings reasonably conveyed the rights so that Miller would understand them. Our review of the authority on this issue has not revealed a single decision to support Miller’s proposition that a defendant who is sufficiently advised of his right to a lawyer prior to and during questioning in general must also be additionally informed that counsel will be appointed during questioning. In California v. Prysock, the United States Supreme Court analyzed whether a criminal defendant was adequately informed of his right to the presence of appointed counsel prior to and during interrogation. The Prysock Court stated that a warning was adequate if it fully conveyed the right to have a lawyer present prior to and during interrogation and to have a lawyer appointed at no cost if he could not afford one. In so holding, the High Court noted that the warning given in that case was adequate because it did not suggest any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer prior to and during interrogation in general and did not associate the offer of an appointed attorney with a future point in time after the conclusion of the police interrogation, such as an upcoming court date. See id. at 360-61.
Applying the analysis of the Prysock Court here, Miller concedes that he was sufficiently advised of his right to a lawyer in general, including the right to a lawyer before and during questioning. In addition, because Miller was advised of his right to appointed counsel before questioning, the offer of an appointed attorney was not associated with a future time after the conclusion of the interrogation. Therefore, the warnings given to Miller were adequate because they did not suggest “any limitation on the right to the presence of appointed counsel that was different from the clearly conveyed rights to a lawyer in general.” Id.
Furthermore, Miller has prior experience with the law and exposure to the Miranda warnings. “The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights.” Coyote v. United States, 380 F.2d 305, 308 (10th Cir.1967). Miller’s background and knowledge of law enforcement demonstrate that he understood the warnings with regard to his rights. In fact, he expressly stated to law enforcement that he normally would not talk to police and would first to talk to an attorney, but was going to “do something that he had never done before.” Thus, Miller expressed a willingness to talk that was premised on his prior understanding that he had a right to an attorney, which is a right he normally utilized. When the warnings given to Miller are considered in context with his age, background, and intelligence, they imparted a “clear, understandable warning of all of his rights.” Coyote, 380 F.2d at 308.
Accordingly, the trial court properly denied the motion to suppress because Miller was fully informed of his right to have counsel appointed. We conclude that the warnings were sufficient and adequate under the Florida and United States constitutions.
*224 Witness Comments
Miller contends that the trial court committed reversible error in allowing witnesses to mention that the crimes occurred on Easter Sunday and in denying a motion for mistrial on this issue. In addition, Miller asserts that the trial court erroneously admitted testimony with regard to the occupation of the victim’s son. We deny relief on these issues because the trial court did not abuse its discretion.
This Court reviews a ruling on the admission of evidence and a motion for mistrial for an abuse of discretion. See San Martin v. State, 717 So.2d 462, 470-71 (FIa.1998) (evidentiary rulings); Smith v. State, 866 So.2d 51, 58-59 (Fla.2004) (motions for mistrial). In addition, a motion for mistrial should only be granted when premised on an error that is so prejudicial as to vitiate the entire trial. See England v. State, 940 So.2d 389, 401-02 (Fla.2006).

The References to Easter Sunday Were Not Unduly Prejudicial

Miller maintains that the admission of irrelevant and inflammatory evidence concerning Easter Sunday was unduly prejudicial and, therefore, deprived him of his constitutional right to a fair trial. In Florida, all relevant evidence is admissible, unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence. See § 90.402-.403, Fla. Stat. (2006). Here, the only references to Easter Sunday were purely factual and probative because they established the circumstances of the witnesses traveling through the neighborhood. Moreover, the reference enhanced the credibility of the witnesses’ recollection because it oriented the witnesses to a specific, memorable event rather than an arbitrary Sunday. It is clear from the record that the mention of Easter Sunday was not of such a nature as to evoke the sympathy of the jury or to prejudice Miller. Compare Welty v. State, 402 So.2d 1159, 1162 (Fla.1981) (affirming admission of identification testimony from victim’s relative because it did not evoke juror sympathy or prejudice the defendant), to Francis v. State, 473 So.2d 672, 676-77 (Fla.1985) (discussing highly emotional closing argument “which amounted to a non-legal sermon referencing several times to Easter, the Last Supper of Jesus and his disciples, and the covenant of God’s love for humanity which must be passed along with the cup of forgiveness to the next generation of children”).
This testimony is not unduly prejudicial under the test for admissibility of evidence, therefore it clearly does not demonstrate reversible error under the heightened standard for a mistrial. In other words, if the evidence was properly admitted, it is also not so prejudicial as to vitiate the entire trial. Here, the unemotional mention of Easter Sunday did not cast Miller in a prejudicial light such as to require a new trial. Thus, the trial court did not abuse its discretion in allowing the mention of Easter Sunday in testimony and in denying the motions for mistrial.

The Testimony with Regard to Occupation Was Not Unduly Prejudicial

Next, Miller asserts that the trial court erred in allowing the State to solicit testimony with regard to the occupation of the victim’s son. Miller contends that this information is irrelevant and prejudicial for the reason that the jury would determine the defendant was guilty, in part, because the victim’s son is an attorney.
It is common practice on direct examination to inquire about a witness’s occupation to establish background. See Gregory P. *225 Brown, Direct Examination, in Florida Civil Trial Practice § 10.5 (7th. ed.2005); see also Neil T. Shayne, Winning the Slip and Fall Case, in Litigation and Administrative Practice Course Handbook Series at 87 (Practising Law Institute 1998). Typically, it enhances the credibility of the witness by humanizing him or her. See Brown § 10.5. Furthermore, a jury is not presumed to discount all the evidence only to decide a case upon the fact that the victim’s son is an attorney. Cf. People v. Drucker, 100 Misc.2d 91, 418 N.Y.S.2d 744, 744 (N.Y.Crim.Ct.1979) (discussing whether a priest could testify with regard to his occupation while wearing clerical garb). It is a simple fact that the son is an attorney. He truthfully answered a general background question that is commonly asked on direct examination concerning his occupation, and the testimony on his profession was limited to that one instance.
Accordingly, in this circumstance, it was not unduly prejudicial for the witness to testify that he is a lawyer. Thus, the trial court did not abuse its discretion in allowing the witness to answer the question with regard to his profession.
Prior Violent Felony
Miller contends that the trial court erred in admitting evidence that established the underlying prior violent felony of homicide because the details of the offense went beyond the factual basis Miller included on his petition to enter a guilty plea to the lesser offense of manslaughter. During a penalty phase proceeding, the trial court has the discretion to admit evidence with regard to the details of a defendant’s previous conviction for a felony involving the use or threat of violence. See § 921.141(1), (5)(b), Fla. Stat. (2006); Rhodes v. State, 547 So.2d 1201, 1204 (Fla.1989); Tompkins v. State, 502 So.2d 415, 419 (Fla.1986). This Court reviews the admission or exclusion of evidence for an abuse of discretion. See San Martin v. State, 717 So.2d 462, 470-71 (Fla.1998).
Here, the State introduced details with regard to Miller’s prior conviction for manslaughter in Oregon. This Court has repeatedly held that the State is not restricted to the bare admission of a conviction when presenting evidence in support of the prior violent felony aggravating circumstance. See Rhodes, 547 So.2d at 1204; Delap v. State, 440 So.2d 1242, 1255-56 (Fla.1983); Elledge v. State, 846 So.2d 998, 1001-02 (Fla.1977). Rather, the State may adduce any testimony that the trial court deems relevant to the nature of the crime and the character of the defendant. See § 921.141(1), Fla. Stat. (2006); Delap, 440 So.2d at 1255. “Whether a crime constitutes a prior violent felony is determined by the surrounding facts and circumstances of the prior crime.” Anderson v. State, 841 So.2d 390, 407 (Fla.2003) (holding that trial court did not err in admitting testimony that demonstrated the defendant’s conviction for attempted sexual battery was actually a completed sexual battery). In Elledge, we explained:
This is so because we believe the purpose for considering aggravating and mitigating circumstances is to engage in a character analysis of the defendant to ascertain whether the ultimate penalty is called for in his or her particular case. Propensity to commit violent crimes surely must be a valid consideration for the jury and the judge. It is matter that can contribute to decisions as to sentence which will lead to uniform treatment and help eliminate “total arbitrariness and capriciousness in [the] imposition” of the death penalty.
346 So.2d at 1001(emphasis supplied) (quoting Proffitt v. Florida, 428 U.S. 242, 258, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)). In addition, “[t]estimony concerning the *226 events which resulted in the conviction assists the jury in evaluating the character of the defendant and the circumstances of the crime so that the jury can make an informed recommendation as to the appropriate sentence.” Rhodes, 547 So.2d at 1204.
Even if a defendant has pled guilty to a lesser offense, the trial court may allow the State to present evidence that demonstrates a greater offense. See Bevel v. State, 983 So.2d 505, 518 (Fla.2008) (approving the admission of testimony that established the defendant actually committed a greater offense than the offense to which he pled guilty); Delap, 440 So.2d at 1255 (holding that the trial court properly allowed the State to present evidence that demonstrated the use or threat of violence to the person during commission of an offense resulting in a reduced charge); see also Morgan v. State, 415 So.2d 6, 12 (Fla.1982) (holding that it was not error to allow the penalty phase jury to hear evidence that the defendant’s previous conviction for second-degree murder was obtained pursuant to an indictment for first-degree murder).
Moreover, in Reynolds v. State, 934 So.2d 1128 (Fla.2006), the State introduced testimony that provided details surrounding a prior violent felony conviction that also included facts which established crimes for which the defendant was not convicted. This Court rejected the argument that introduction of this testimony was improper and concluded that the victim’s testimony “merely relayed the details surrounding” the previous conviction. Id. at 1149. Although it involved circumstances that possibly suggested the simultaneous commission of other crimes for which the defendant was not convicted, the testimony appropriately provided the jury with details surrounding the prior conviction, which were essential in assisting the “jury in evaluating the character of the defendant and the circumstances of the crime so that the jury [could] make an informed recommendation as to the appropriate sentence.” Id. at 1149-50 (quoting Rhodes, 547 So.2d at 1204).
As in Delap, Bevel and Anderson, Miller was originally charged with a higher degree of homicide and pled guilty to the lesser included offense of manslaughter. The State properly introduced testimony that provided the underlying details of the prior conviction to assist the jury in evaluating Miller’s character. Although one aspect of the testimony indicated that Miller threatened the victim prior to the murder, this was a relevant facet of Miller’s character and indicative of his propensity to commit violent crimes. Furthermore, Miller provides no authority for his assertion that the details of the underlying offense should be limited to the facts Miller included in his petition to enter a guilty plea. Thus, the trial court did not abuse its discretion when it allowed the State to introduce evidence with regard to the nature of the prior violent felony. Accordingly, we affirm on this issue.
Avoid Arrest Aggravating Circumstance
Miller maintains that the trial court should not have instructed the jury that it could consider the avoid arrest aggravating circumstance because the evidence did not support such an instruction, as evidenced by the trial court’s ultimate rejection of the circumstance in imposing the sentence of death. Miller’s assertion is meritless because the State presented competent and substantial evidence in support of this aggravating circumstance. As this Court has repeatedly articulated, a trial court is required to instruct a jury on an aggravating circumstance if the evidence adduced during trial is legally sufficient to support a finding of that circumstance. See Welch v. State, 992 So.2d 206, *227 215-16 (Fla.2008) (“[T]he trial court properly instructed the jury on CCP because the State introduced credible and competent evidence in support of the aggravator.”); Hunter v. State, 660 So.2d 244, 252 (Fla.1995) (“A judge should instruct a jury only on those aggravating circumstances for which credible and competent evidence has been presented.”); Bowden v. State, 588 So.2d 225, 231 (Fla.1991) (“Where, as here, evidence of a mitigating or aggravating factor has been presented to the jury, an instruction on the factor is required”) (emphasis supplied); Stewart v. State, 558 So.2d 416, 420 (Fla.1990) (stating that trial court is required to instruct on all aggravating circumstances “for which evidence has been presented”). Therefore, a trial court’s ultimate determination that an aggravating circumstance was not proven beyond a reasonable doubt does not necessitate a conclusion that there was insufficient evidence to allow the jury to consider the factor for purposes of the advisory sentence. See Davis v. State, 928 So.2d 1089, 1132 (Fla.2005) (citing Pace v. State, 854 So.2d 167, 181 (Fla.2003) (quoting Bowden, 588 So.2d at 231)).
In its sentencing order, the trial court found that the evidence did not demonstrate beyond a reasonable doubt that the sole or dominant motive for the murder was to eliminate Smith as a witness, despite some evidence supporting the factor. A review of the record reveals that the State presented competent and substantial evidence to support a jury instruction on the avoid arrest aggravating circumstance. For example, Miller informed law enforcement that prior to stabbing Haydon, Miller was contemplating that he did not want to go back to jail or prison. After stabbing Haydon, Miller followed Smith to the back yard and proceeded to stab her instead of fleeing the scene. In addition, Miller stated that he heard the neighbors nearby, and he wanted Smith to stop screaming. To make her stop screaming, he stabbed her. This creates an inference that he stabbed her to prevent the neighbors from hearing the screams. Therefore, the trial court did not err by instructing the jury on this aggravating circumstance because the State presented competent and substantial evidence to support it. Accordingly, we deny relief on this issue.
Sufficiency
Although Miller has not challenged the sufficiency of the evidence, this Court has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed. See Blake v. State, 972 So.2d 839, 850 (Fla.2007); Fla. R.App. P. 9.142(a)(6). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Bradley v. State, 787 So.2d 732, 738 (Fla.2001) (citing Banks v. State, 732 So.2d 1065, 1068 n. 5 (Fla.1999)).
The jury found Miller guilty of first-degree murder on a general verdict form. “A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation.” Crain v. State, 894 So.2d 59, 73 (Fla.2004). We conclude that the record contains competent, substantial evidence to support Miller’s conviction for the first-degree murder of Jerry Smith under either the premeditated or felony-murder theory. Miller confessed to law enforcement that he walked several miles to Smith’s house with the intent to rob her and carried a sharp filet knife with him. He confessed that as he attempted to steal Smith’s jewelry, Haydon interrupted this *228 attack. In response, Miller stabbed Hay-don directly in the chest. While Miller and Haydon struggled, Smith fled out the backdoor into her backyard. Miller deliberately followed Smith out the back door and stabbed her several times rather than ending the encounter by fleeing from the house.
This Court has held that “[p]remeditation is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.” Asay v. State, 580 So.2d 610, 612 (Fla.1991). Miller’s statements that there was a break between his initial struggle with Smith during the attempted robbery and the ultimate decision to fatally stab her indicate that he was conscious of the nature of the act he was about to commit and the probable result of that act. Thus, the statements from Miller’s confession constituted direct evidence of his guilt under either theory of first-degree murder.
In addition, the location of the stab wounds on Smith support a finding of premeditation. See Perry v. State, 801 So.2d 78, 85-86 (Fla.2001) (“Although multiple stab wounds alone do not prove premeditation, the nature and location of these wounds do support the finding of premeditation.”); Jimenez v. State, 703 So.2d 487, 440 (Fla.1997) (holding that the deliberate use of a knife to stab a victim multiple times in vital organs is evidence that can support a finding of premeditation). The medical examiner testified that the cause of death was multiple stab wounds, including (1) a stab wound that entered the chest cavity and went through the diaphragm, spleen, stomach, and into the colon, causing lacerations to the spleen and blood in the abdomen; (2) a stab wound to the anterior right hip that penetrated the abdomen, the colon, the large intestine, and the retroperitoneal area behind the abdominal cavity; and (3) a stab wound that penetrated through Smith’s arm. Accordingly, Miller deliberately stabbed Smith in locations that penetrated and caused lacerations to her vital organs. The force of the stabbing was great, as demonstrated by the knife penetrating through Smith’s arm and also slicing deep into her abdominal cavity. Thus, Miller’s confession coupled with the medical examiner’s testimony provides competent, substantial evidence to support a conviction for premeditated murder.
Moreover, Miller’s roommate testified that Miller discussed his plan to rob Smith prior to the murder, and that on the night of the murder, Miller stated that “everything that could go wrong did go wrong” and that “some guy tried to be a hero [but] his hero days were over.” Moreover, the victim Larry Haydon identified Miller as the assailant who stabbed him and that he saw struggling with Smith.
Lastly, physical evidence linked Miller to the murder. The knife and sheath were located where Miller informed law enforcement he had discarded them. Moreover, Miller’s fingerprints were found on a plastic cup in Smith’s home. Blood in Smith’s dining room matched Miller’s DNA. Miller’s blood was also found on a chair at his acquaintance’s house, and the acquaintance testified that Miller sat in the chair on the night of the murder, Smith’s jacket was also recovered in that same area. Furthermore, a partial DNA match was obtained for a crack pipe recovered from the Smith residence, and Miller confessed that he lost the crack pipe during the altercation.
Based on a review of the evidence presented in this case, a “rational trier of fact could have found the existence of the elements of the crime beyond a reasonable *229 doubt.” Simmons, 934 So.2d at 1111 (quoting Bradley, 787 So.2d at 738). Thus, we conclude that the evidence is sufficient to support Miller’s capital conviction under either theory of first-degree murder.
Proportionality
Although Miller does not challenge the proportionality of his death sentence, this Court has an independent obligation to conduct a proportionality analysis. See England v. State, 940 So.2d 389, 407 (Fla.2006); see also Fla.R.App. P. 9.142(a)(6). In deciding whether death is a proportionate penalty, the Court conducts a comprehensive analysis to determine “whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.” Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003) (citation omitted). Accordingly, the Court considers the totality of the circumstances and compares the present case with other similar capital cases. See Duest v. State, 855 So.2d 33, 47 (Fla.2003) (quoting Terry v. State, 668 So.2d 954, 965 (Fla.1996)). This entails “a qua litative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.” Urbin v. State, 714 So.2d 411, 416 (Fla.1998). In reviewing the sentence for proportionality, this Court accepts the jury’s recommendation and the trial court’s weighing of the aggravating and mitigating evidence. See Bates v. State, 750 So.2d 6, 12 (Fla.1999).
After considering the totality of the circumstances and comparing the present case with other cases that contain similar aggravating and mitigating circumstances, we determine that the death penalty is a proportionate punishment for the first-degree murder of Jerry Smith. Cf. Salazar v. State, 991 So.2d 364, 379 (Fla.2008), cert. denied, - U.S.-, 129 S.Ct. 1347, 173 L.Ed.2d 614 (2009). This case involves the fatal stabbing of a 72-year-old woman, who suffered from Alzheimer’s dementia, in the privacy of her home. The trial court found the following five aggravating circumstances, all of which it gave great weight: (1) the capital felony was committed by a person previously convicted of a felony and under a sentence of imprisonment (parole); (2) the defendant was previously convicted of a felony involving the use or threat of violence to the person; (3) the capital felony was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit the crime of robbery or burglary; (4) HAC; and (5) the victim of the capital felony was particularly vulnerable due to advanced age or disability. The trial court found no statutory mitigation, but found six nonstat-utory mitigating circumstances as follows: (1) dysfunctional family (some weight); (2) prior military service (very little weight); (3) cooperation with law enforcement (little weight); (4) remorse (very little weight); (5) antisocial personality disorder (little weight); and (6) long history of substance abuse (some weight).
This Court has determined that the death penalty was proportionate in other decisions involving the fatal stabbing of women. In Jimenez v. State, 703 So.2d 437 (Fla.1997), receded from on other grounds by Delgado v. State, 776 So.2d 233 (Fla.2000), this Court found the death penalty proportionate where, as here, the defendant fatally stabbed a 63-year-old woman inside her home during a burglary. See id. at 442. In Jimenez, the trial court found four aggravating circumstances, which included ones substantially similar to those found in Miller’s case: (1) the capital felony was committed by a person previously convicted of a felony and placed *230 on community control; (2) the defendant was previously convicted of another capital felony or felony involving the use or threat of violence to the person; (3) the capital felony was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit the crime of burglary of an occupied dwelling; and (4) HAC. In Jimenez, the court found one statutory mitigating circumstance (lack of capacity to appreciate the criminality of conduct), and two nonstatutory mitigating circumstances — (1) Jimenez’s potential for rehabilitation; (2) Jimenez’s potential sentence (“Life with a twenty-five year minimum mandatory is calculated by the Department as a ninety-nine year sentence with a release date at age eighty-one.” Id. at 439 n. 3.). In the present case, the trial court found an additional aggravating circumstance, no statutory mitigating circumstances, and six nonstatutory mitigating circumstances.
This Court determined Jimenez was proportionate in comparison to Johnson v. State, 660 So.2d 637 (Fla.1995). In Johnson, this Court found the death penalty proportionate where the defendant fatally stabbed a 73-year-old woman inside her home during a burglary. There, the trial court found three aggravating circumstances — (1) prior violent felony; (2) commission of a murder for financial gain; and (3) HAC — and fifteen mitigating circumstances. See id. at 641; see also Morrison v. State, 818 So.2d 432 (Fla.2002) (fatal stabbing of 82-year-old man in his home, with four weighted aggravators — -(1) prior violent felonies; (2) the murder was committed during a robbery and burglary with assault; (3) HAC; and (4) the victim was particularly vulnerable due to advanced age and disability — no statutory mitigating circumstances, and eight nonstatutory mitigating circumstances). Therefore, these capital decisions indicate that the death sentence imposed here is proportionate to the circumstances of the capital offense.
Based on the specific facts and circumstances of the murder, and the aggravating and mitigating circumstances found by the trial court, the death sentence in this case is proportionate when compared with other capital cases. Accordingly, we affirm the death sentence.
CONCLUSION
For the reasons expressed above, we affirm Miller’s convictions and sentences.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., specially concurs with an opinion, in which PERRY, J., concurs.
CANADY, J., concurs in result with an opinion, in which POLSTON, J., concurs.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. In Apprendi, the U.S. Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.” 530 U.S. at 490, 120 S.Ct. 2348.

. Florida Rule of Criminal Procedure 3.140(o) provides:
No indictment ... shall be dismissed or judgment arrested, or new trial granted on account of any defect in the form of the indictment ... or for any cause whatsoever, unless the court shall be of the opinion that the indictment or information is so vague, indistinct, and indefinite as to mislead the accused and embarrass him or her in the preparation of a defense or expose the accused after conviction or acquittal to substantial danger of a new prosecution for the same offense.
(Emphasis supplied.)

. "No person shall be present at the sessions of the grand jury except the witness under examination, one attorney representing the witness for the sole purpose of advising and consulting with the witness, the state attorney and her or his assistant state attorneys, designated assistants as provided for in s. 27.18, the court reporter or stenographer, and the interpreter.”

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).