# Supreme Court of Florida

_____

No. SC13-516
_____

**LIONEL MICHAEL MILLER,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC13-1786
_____

**LIONEL MICHAEL MILLER,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[February 26, 2015]

PER CURIAM.

Lionel Michael Miller appeals an order entered in the circuit court that

denied his motion to vacate his conviction of first-degree murder and sentence of

death filed pursuant to Florida Rule of Criminal Procedure 3.851.  He also petitions

this Court for a writ of habeas corpus.  We have jurisdiction.  See art. V, § 3(b)(1), (9), Fla. Const.  As explained below, we affirm the order of the postconviction court and deny Miller's petition for a writ of habeas corpus.

## FACTS AND BACKGROUND

Lionel Miller was convicted and sentenced to death for the first-degree murder of Jerry Smith, a seventy-two-year-old woman.  Miller v. State, 42 So. 3d 204, 209-10 (Fla. 2010).  Miller was also convicted of the attempted first-degree murder of Larry Haydon, burglary of a dwelling with a battery therein, and attempted robbery with a deadly weapon.  Id.  In affirming Miller's convictions, this Court detailed the facts surrounding the murder:

> [O]n April 14, 2006, . . . Miller and his roommate drove through Delaney Park in Orlando and observed 72-year-old Jerry Smith standing in her front yard.
>
> Miller stopped and inquired of Smith as to whether the mail had been delivered to her residence that day.  Smith was friendly and spoke with Miller for approximately thirty minutes.  During this discussion, Miller noticed that Smith experienced memory lapses because she repeated the same story several times.  During trial, the medical examiner testified that Smith suffered from Alzheimer's dementia, which caused her to easily forget things and repeat herself during conversations.
>
> While conversing with Smith, Miller also noticed her jewelry.  After the conversation concluded and the men drove away, Miller noted that Smith would be an easy target for a robbery because of her memory lapses.  Miller solicited the assistance of his roommate in a plan to rob Smith, but his roommate would not join in the crime. . . . During the next two days, Miller repeatedly asked his roommate to

- 2 -

transport him to the Smith residence, but the roommate avoided Miller and continued to refuse to join the crime.

On April 16, 2006, which was Easter Sunday, after being with her family during the day, at approximately 7:45 p.m., a neighbor observed that Smith had returned home and was seated on her front porch. While Smith was sitting on her porch, Miller arrived after walking approximately five miles to her residence. Unknown to Smith, Miller had smoked crack cocaine while he walked and carried a filet knife. Smith invited Miller inside and provided him with a glass of water. Miller left the plastic cup on a table, and his fingerprints were later identified on the cup.

Initially, Smith removed an embroidered jacket she was wearing and placed it on a chair in the front room. While in the living room, the two chatted about Smith's travels to Key West until Smith became concerned. At that point, Smith opened the blinds on her front window but Miller then threw her on the couch and attempted to steal her jewelry. As Smith screamed and resisted, Miller attempted to prevent her screams by covering her mouth with his hand.

As the struggle ensued, Larry Haydon was in the area walking his dog when he noticed that Smith's blinds were open, and through the window he observed a man, whom he identified as Miller during trial, struggling with Smith inside her home. Haydon heard Smith scream and cry out, "Leave me alone." In response to this distress, Haydon approached the house. Miller called through the window that there was no problem inside the house, but Haydon proceeded to open the unlocked front door.

Miller stated that he was frightened by both the thought of returning to prison and the screams as Haydon was approaching. As Haydon entered the house, Miller retrieved the filet knife from the back of his pants and stabbed Haydon below his rib cage. While Haydon and Miller were struggling in the living room, Smith escaped into the backyard. Upon observing the escape, Miller disengaged from Haydon and followed Smith into the backyard.

When Smith saw that Miller had followed her, she again began to scream. Miller could hear neighbors talking, and ordered Smith to be quiet, but she continued to scream. Miller admitted that he was high on crack cocaine and the screaming was "driving [him] crazy." He "just lost it" and stabbed Smith three times. Upon being stabbed, Smith first fell to the ground momentarily but then regained her footing and ran along the side of her house to the front yard.

After Smith had escaped from the backyard, Miller entered the house again. When he realized that he had cut himself during the altercation, Miller retrieved Smith's embroidered jacket from a chair in the front room to use as a bandage before escaping through the back door. As he ran from the Smith residence, Miller discarded the knife in the bushes of a nearby house. The knife was recovered later, and ultimately Miller's DNA was identified on the knife.

As Miller left the scene, a neighbor heard screaming and observed Haydon run to the home beside the Smith residence. The neighbor then saw Smith emerge from the backyard screaming for help. Smith informed the neighbor that a man had broken into her house. Both Haydon and Smith, covered in blood, sought refuge in the residence next door. After contacting emergency services, both Haydon and Smith were transported to the hospital. Haydon survived, but Smith died in the hospital after undergoing emergency surgery.

. . . .

The jury found Miller guilty as to each count. During the penalty phase, the medical examiner testified that Smith suffered from Alzheimer's dementia, and identified the cause of death as multiple stab wounds. The medical examiner also testified that Smith was conscious during and after the attack and likely felt great pain.

The State presented the testimony of Miller's parole officer in Oregon, who stated that Miller was currently on parole for armed robbery and had failed to attend his parole meetings. The State also

presented the testimony of several witnesses to establish the underlying details of Miller's prior armed robbery and manslaughter convictions.

Miller presented the testimony of an investigator who conducted a family background investigation on Miller. In addition, Miller presented a psychologist who testified with regard to Miller's family background and substance abuse history. The psychologist diagnosed Miller as having an antisocial personality disorder. In rebuttal, the State presented the testimony of a psychiatrist who also diagnosed Miller as having an antisocial personality disorder in conjunction with polysubstance dependence and dysthymia, which is a long-term, low-level syndrome of depression.

Id. at 209-12. The jury recommended a sentence of death for the murder of Smith by a vote of eleven to one. Id. at 212.

After the Spencer[1] hearing, the trial court imposed a sentence of death. Id. The trial court found five aggravating circumstances, each of which it gave great weight: (1) the capital felony was committed by a person previously convicted of a felony and under a sentence of imprisonment; (2) Miller had been previously convicted of a felony involving the use or threat of violence to the person; (3) the capital felony was committed while Miller was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit the crime of robbery or burglary; (4) the capital felony was especially heinous, atrocious, and

---

1. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

- 5 -

cruel (HAC); and (5) the victim of the capital felony was particularly vulnerable due to advanced age or disability. Id.

The trial court found no statutory mitigating circumstances, but found six nonstatutory mitigating circumstances. Specifically, the trial court concluded that Miller: (1) had a dysfunctional family (some weight); (2) previously served in the military (very little weight); (3) cooperated with law enforcement (little weight); (4) demonstrated remorse (very little weight); (5) suffered from antisocial personality disorder (little weight); and (6) suffered from a long history of substance abuse (some weight). Id.

On direct appeal, Miller presented six claims. He alleged that the trial court erred when it: (1) excused a prospective juror for cause; (2) denied Miller's motion to suppress his confession; (3) allowed witnesses to mention that the crimes occurred on Easter Sunday and denied his motion for mistrial on this claim, and admitted testimony regarding the occupation of the victim's son; (4) permitted the admission of evidence that established the underlying prior violent felony aggravating circumstance; and (5) instructed the jury that it could consider the avoid arrest aggravating circumstance. Id. at 213-27. Miller also presented multiple challenges to the constitutionality of Florida's capital sentencing scheme. Id. at 214-19. This Court denied relief on all claims and affirmed Miller's

convictions and sentences. Id. at 230. The United States Supreme Court denied certiorari review on January 10, 2011. Miller v. Florida, 131 S. Ct. 935 (2011).

**Postconviction Proceedings**

On December 21, 2011, Miller filed a motion to vacate judgment of convictions and sentences. Specifically, Miller alleged that: (1) counsel performed ineffectively when they failed to obtain a PET scan and present the results to demonstrate that he did not knowingly waive his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and that his confession was not voluntary; (2) counsel performed ineffectively when they failed to present expert testimony regarding Miller's mental condition to demonstrate that the waiver of his Miranda rights was involuntary; (3) the State failed to: (a) disclose material impeachment evidence regarding a State witness, and (b) correct the witness's false and misleading testimony (under this claim, Miller also alleged that counsel either were laboring under an actual conflict of interest or were generally ineffective, thereby preventing the defense from discovering and utilizing all available evidence to impeach the witness); (4) counsel performed ineffectively when they hired Dr. Jeffrey Danziger, listed him as a witness, and then allowed the prosecution to present his testimony in violation of the attorney-client privilege; (5) counsel performed ineffectively when they failed to fully investigate and develop social and mental health evidence that would have been mitigating; (6) counsel

performed ineffectively when they failed to: (a) object to improper comments regarding the death penalty during voir dire, (b) present an opening statement during the penalty phase, (c) object to improper comments by the prosecutor during opening and closing statements, and (d) argue for mercy during closing statements. Miller also alleged that his sentence of death should be vacated because he will be incompetent when this case reaches the conclusion of the appellate proceedings and, therefore, he will be in a class of individuals who are categorically excluded from execution. Id. After a case management conference, the postconviction court granted an evidentiary hearing on every claim except the incompetency claim.

During the evidentiary hearing, Miller presented eight witnesses. In addition to the testimony of Gerod Hooper and Larry Henderson, the assistant public defenders who represented Miller during the guilt and penalty phase trials, Miller presented the testimony of: (1) David Dempsey, Miller's roommate at the time of the murder; (2) Dempsey's mother, Janice Dempsey; (3) Deborah Hood; and (4) a Florida Department of Corrections (DOC) probation officer to discuss an incident that occurred between Dempsey and his mother shortly before Miller's murder trial. Miller also presented expert testimony from Dr. Frank Wood, an expert in neuropsychology and neuroimaging, and Dr. Glenn Caddy, an expert in forensic psychology and neuropsychology. The State presented three witnesses: (1) Joni

Johnston, a mitigation specialist employed by the Office of the Public Defender;

(2) Dr. Alan Waldman, an expert in neuropsychology and cognitive neurology; and

(3) Dr. Eric Mings, a psychologist.

On February 24, 2013, the postconviction court issued an order denying all claims. This appeal followed.

## ANALYSIS

### Strickland Standard of Review

Several of Miller's claims challenge the determination of the postconviction court that counsel did not perform ineffectively during trial. This Court recently described what a defendant must establish to succeed on a claim of ineffective assistance of trial counsel:

> [T]he test when assessing the actions of trial counsel is not how, in hindsight, present counsel would have proceeded. See Cherry v. State, 659 So. 2d 1069, 1073 (Fla. 1995). On the contrary, a claim for ineffective assistance of trial counsel must satisfy two criteria. First, counsel's performance must be shown to be deficient. Strickland v. Washington, 466 U.S. 668, 687 (1984). Deficient performance in this context means that counsel's performance fell below the standard guaranteed by the Sixth Amendment. Id. When examining counsel's performance, an objective standard of reasonableness applies, id. at 688, and great deference is given to counsel's performance. Id. at 689. The defendant bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). This Court has made clear that "[s]trategic decisions do not constitute ineffective assistance of counsel." See Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). There is a strong presumption that trial counsel's performance was not ineffective. See Strickland, 466 U.S. at 669.

Second, the deficient performance must have prejudiced the defendant, ultimately depriving the defendant of a fair trial with a reliable result. [Id. at] 689. A defendant must do more than speculate that an error affected the outcome. Id. at 693. Prejudice is met only if there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Both deficient performance and prejudice must be shown. Id.

Bradley v. State, 33 So. 3d 664, 671-72 (Fla. 2010).

Ineffective assistance claims are reviewed under a mixed standard of review because the performance and prejudice prongs of Strickland present mixed questions of law and fact. Id. at 672. Postconviction courts hold a superior vantage point with respect to questions of fact, evidentiary weight, and the demeanor and credibility of witnesses. See Cox v. State, 966 So. 2d 337, 357-58 (Fla. 2007). As a result, this Court defers to the postconviction court's factual findings if those findings are supported by competent, substantial evidence. See Bradley, 33 So. 3d at 672. However, the postconviction court's legal conclusions are reviewed de novo. Id. Finally, because Strickland requires that a defendant establish both deficiency and prejudice, an appellate court evaluating a claim of ineffectiveness is not required to issue a specific ruling on one component of the test when it is evident that the other component is not satisfied. See Mungin v. State, 932 So. 2d 986, 996 (Fla. 2006).

Our review of counsel's performance in this case is unique in that Henderson, Miller's lead attorney during the penalty phase, testified during the evidentiary hearing that Miller informed counsel that he did not want to be executed, but still wanted them to seek a sentence of death. Henderson testified that Miller, who had spent the majority of his life incarcerated, preferred to live on death row, where he would have his own cell and television. Miller also was of the opinion that he was suffering from defects in his frontal lobe that could worsen over time to such an extent that they may eventually preclude his execution. Miller was also of the view that for purposes of appeal, a unanimous jury recommendation of death was not as favorable to his desired outcome as a non-unanimous jury recommendation. Thus, Miller instructed his attorneys to approach the penalty phase with the goals of securing a non-unanimous recommendation while prolonging the direct appeal and postconviction processes for as long as possible. As a result, Miller instructed his defense team to: (1) present a limited amount of mitigation to secure a non-unanimous jury verdict; and (2) preserve as many issues as possible for appeal.[2]

---

2. Henderson testified during the evidentiary hearing that he did not notify the trial court of this strategy because "that was a communication by the client to me about what he wanted me to do, the results he wanted. It was not an illegal request. It was not a request that I do something unethical. If it had come to the point that he said, I don't want a penalty phase, I don't want to present anything,

During the postconviction proceedings, Miller has not disputed that this was his strategy, nor does he contend that counsel performed ineffectively when they followed his instructions to seek the death penalty.  Accordingly, in evaluating counsel's performance against an objective standard of reasonableness, we keep in mind the Supreme Court's statement in Strickland:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information. . . .  In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

466 U.S. at 691.  Based on this context, we address Miller's claims alleging that trial counsel performed ineffectively.

### Improper Listing of a Witness

In his first claim, Miller alleges that counsel performed deficiently when they failed to recognize that Dr. Danziger's testimony was not favorable to the defense before listing him as a witness, failed to object when the State sought to depose Dr. Danziger, and failed to object during several portions of Dr. Danziger's

---

I'm asking for the death penalty, at the time I would have informed the Court, naturally, about that."

- 12 -

penalty phase testimony. Miller claims that these failures provided the State with expert testimony that prejudicially impacted the jury with regard to the aggravation and mitigation presented.

Henderson testified that he retained Dr. Danziger in 2007 to assist in the determination of whether Miller was competent to proceed to trial. Henderson testified that he believed Dr. Danziger, a psychiatrist, could provide a unique perspective of Miller's life and would also convey to the jury that Miller: (1) suffered from antisocial personality disorder; (2) had a substantial history of drug abuse; and (3) had a dysfunctional childhood. Henderson testified that he carefully limited the information provided to Dr. Danziger and intentionally did not provide him with specific details of Miller's homicide conviction in Oregon. In June 2007, Henderson wrote a letter to Dr. Danziger, expressing concern with Dr. Danziger's opinion that antisocial personality disorder could not be considered mitigating. Henderson explained in the letter that whether a psychological disorder is legally mitigating was not for Dr. Danziger to determine, and this Court has held that, under limited circumstances, antisocial personality disorder can be considered as a mitigating circumstance. See, e.g., Morton v. State, 789 So. 2d 324, 329-30 (Fla. 2001) (concluding that "[b]oth the United States Supreme Court and this Court have determined that a defendant's antisocial personality disorder is a valid mitigating circumstance for trial courts to consider and weigh.").

Several months later, Henderson listed Dr. Danziger as a penalty phase witness. Shortly thereafter, the State deposed Dr. Danziger. Henderson described Dr. Danziger's deposition testimony as "certainly favorable to the State" and as providing "ammunition" which would allow the State to effectively cross-examine Dr. Danziger in the event he was presented as a defense witness. Henderson testified that he was disappointed, but not surprised, by Dr. Danziger's testimony. He further explained that after hearing Dr. Danziger's deposition testimony, he was forced to reconsider his trial strategy because he realized that Dr. Danziger's testimony would actually be unfavorable. Henderson ultimately decided not to present Dr. Danziger during the penalty phase, and to instead wait for the State to present his testimony. Henderson believed that if the State presented Dr. Danziger as a witness, he could effectively cross-examine Dr. Danziger, who would respond defensively to leading questions. Henderson also thought he could force Dr. Danziger to admit that antisocial personality disorder can be mitigating under certain circumstances.

During the penalty phase, the State did present Dr. Danziger as contemplated, who testified that Miller suffered from polysubstance dependence in remission; dysthymia, a long-term low level syndrome of depression; and antisocial personality disorder. Dr. Danziger also described the clinical definition of antisocial personality disorder and noted that the terms "sociopath" and

"characterological disorder" are often utilized by members of the psychiatric community to describe individuals with antisocial personality disorder.

The postconviction court denied this claim, concluding that counsel made reasonable, strategic decisions both when they listed Dr. Danziger as a witness and then decided to use a trial strategy to impeach his testimony on cross-examination.

Deficiency

Dr. Danziger was initially retained by the defense as a confidential expert several months before trial. Henderson had worked with Dr. Danziger in the past and testified that he retained Dr. Danziger because his unique qualifications and his status as a medical doctor specializing in psychiatry allowed him to evaluate and diagnose Miller's medical illnesses as well as his polysubstance abuse and antisocial personality disorder. Despite these benefits, Henderson was aware that Dr. Danziger's findings would not be overwhelmingly beneficial to the defense, because Dr. Danziger believed that antisocial personality disorder could never be utilized as a mitigating factor.

Henderson testified that he had multiple discussions with Miller, during which he explained that Dr. Danziger's evaluation would remain confidential until Dr. Danziger was listed a witness. Henderson also spoke with Miller before listing Dr. Danziger as a witness, and Miller expressed no objection to presenting Dr.

Danziger as a penalty phase witness.[3]  At that point, Henderson listed Dr. Danziger as a witness pursuant to Florida Rule of Criminal Procedure 3.220(d)(1)(A), which requires that the defense furnish the prosecutor with a written list of the names and addresses of all witnesses whom the defendant expects to present during trial.

Curiously, Henderson, who had on multiple occasions discussed with Dr. Danziger his findings regarding Miller, did not realize until <u>after</u> the State deposed Dr. Danziger that his testimony was actually more favorable to the State than to the defense.  It appears that Henderson realized for the first time during the deposition, which occurred less than a month before trial, that Dr. Danziger's testimony would "give the State ammunition to do a very effective cross-examination."  Henderson did not testify during the evidentiary hearing that Dr. Danziger's deposition testimony varied from what they had previously discussed, or that he was surprised by the questions asked by the State.  Rather, Henderson's only explanation as to why he did not realize the implications of Dr. Danziger's testimony was that he was caught off guard by the <u>way</u> Dr. Danziger answered the prosecutor's questions

---

3. Miller contends that counsel's decision to list Dr. Danziger as a witness violated his rights to remain silent, to develop mitigation, and to counsel.  This claim lacks merit because Miller understood that listing Dr. Danziger as a witness meant the information he disclosed to Dr. Danziger would no longer remain confidential, and Miller did not oppose the decision to present Dr. Danziger as a witness.  Thus, counsel did not perform ineffectively.  See <u>Teffeteller v. Dugger</u>, 734 So. 2d 1009, 1019-20 (Fla. 1999) (explaining that counsel cannot be deemed ineffective for failing to present a meritless issue).

during the deposition. Only then did Henderson realize that he needed to change his trial strategy.

We conclude that this conduct constitutes deficient performance. Before listing Dr. Danziger as a witness, Henderson was aware that his testimony would not be favorable to the defense, yet he still believed the benefits of Dr. Danziger's testimony outweighed the detriments to such an extent that he was willing to relinquish his exclusive control over any confidential communications between Miller and Dr. Danziger. For some unknown reason, Henderson did not appreciate or even realize the negative implications of Dr. Danziger's testimony until the State deposed him less than a month before trial. This evidence demonstrates that Henderson's "strategy" to impeach Dr. Danziger's conclusions during cross-examination was an afterthought, hastily made only after he realized that the expert's testimony was significantly more unfavorable to the defense than he originally envisioned. Henderson should have recognized and understood the implications of Dr. Danziger's testimony and the consequences of listing a confidential expert as a witness before he listed Dr. Danziger. Counsel's failure to fully assess the negative implications of Dr. Danziger's testimony before listing him as a witness was objectively unreasonable and cannot be considered a reasonable trial strategy.

Prejudice

To establish prejudice, Miller must demonstrate a reasonable probability exists that Miller would not have received the death penalty had Dr. Danziger's testimony not been presented. See Simmons v. State, 105 So. 3d 475, 503 (Fla. 2012). Miller contends that six aspects of Dr. Danziger's testimony prejudicially impacted the outcome of the penalty phase. Specifically, Miller alleges that Dr. Danziger improperly: (1) "dwelled" on the diagnosis of antisocial personality disorder; (2) equated the terms "sociopath" and "characterological disorder" with antisocial personality disorder; (3) described the circumstances of Miller's military service; (4) recounted what Miller had told him regarding the murder; (5) testified that Miller did not meet the requirements of two statutory mitigating circumstances; and (6) testified that he was initially retained by the defense. While Miller quotes several portions of Dr. Danziger's testimony that he believes are prejudicial, he fails to present any legal authority, or, for that matter, analysis that demonstrates this testimony, individually or cumulatively, undermines confidence in the outcome of the penalty phase.

For example, Miller alleges that Dr. Danziger dwelled on his diagnosis of antisocial personality disorder and "injuriously and prejudicially equate[d] sociopathy with antisocial personality disorder." However, before Dr. Danziger testified, the defense had already presented Dr. Mings, who testified that Miller suffered from polysubstance abuse and antisocial personality disorder. Dr. Mings

- 18 -

explained that antisocial personality disorder "is a way of interacting in the world where one tends to invade the rights of other." Further, on cross-examination, the prosecutor elicited from Dr. Mings that Miller satisfied several of the diagnostic criteria associated with antisocial personality disorder.[4]

Dr. Danziger, who was presented by the State in rebuttal, explained the clinical definition of antisocial personality disorder and how the disorder relates to the term "sociopath." He discussed the relevant diagnostic criteria for the disorder, and testified that antisocial personality disorder and the term "sociopath" are synonyms that are "often used interchangeably by psychiatrists." These statements were only cumulative to the testimony of Dr. Mings and merely explained how the terms "antisocial personality disorder" and "sociopath" were used in the psychiatric community. Miller has failed to present any legal authority that this Court, or another court, has found similar statements to be sufficiently prejudicial to undermine confidence in a sentence of death. Miller's other allegations with regard to Dr. Danziger's penalty phase testimony are similarly supported only by speculative allegations of ineffectiveness, instead of facts and legal authority. Furthermore, based on the established aggravation (five aggravating

_____

4. The defense also presented Dr. Drew Edwards, an expert in addictionology, who testified that Miller suffered from antisocial personality disorder and discussed the correlation between antisocial personality disorder and substance abuse.

circumstances, all of which were given great weight), the relative lack of mitigation (zero statutory mitigating circumstances and six nonstatutory mitigating circumstances, only two of which were afforded "some weight"), we conclude that Miller has failed to demonstrate that he was prejudiced by counsel's deficiency, and we affirm the denial of this claim.

**Failure to Present Mitigation**

In his next claim, Miller alleges that trial counsel failed to present substantial mitigating evidence during the penalty phase. The postconviction court denied this claim, concluding that trial counsel "fully investigated and presented available mitigating evidence regarding Mr. Miller's social history."

Before trial, the defense hired a mitigation specialist to assist in the development of evidence for the penalty phase. She prepared a detailed social history, which included information obtained from Miller's family members; medical, juvenile, and criminal records; and prison records from Florida and Oregon. This information was utilized by multiple mental health experts, who provided extensive testimony during the penalty phase regarding Miller's dysfunctional childhood and polysubstance abuse. See Miller, 42 So. 3d at 212. Of the six nonstatutory mitigating circumstances found by the trial court, three addressed Miller's childhood and troubled background. Id.

During the evidentiary hearing, Miller presented Dr. Caddy, who provided a bleak history of Miller's childhood and upbringing. Dr. Caddy described his childhood as "dysfunctional," and testified that Miller's mother abandoned him at a young age. Miller also had an abusive and disconnected relationship with his stepfather. Dr. Caddy further explained that from the age of four onward, Miller was "thrown out of the house for extended periods of time[,] living under the house, sometimes living in the basement of the house or not living in the immediate area of his [step]father." Dr. Caddy noted that Miller had been exposed to alcohol at a very young age, which initiated a pattern of alcohol abuse that eventually led to substantial drug abuse.

Dr. Caddy's investigation further revealed that while Miller attended reform school, he was raped by a fellow classmate who he believed to be his friend. Dr. Caddy described this as a pivotal point in Miller's life when he "realized he couldn't really trust anybody." Dr. Caddy explained that Miller "suffered protracted sexual abuse" during this time, and developed a hatred for men. Several years later, while living in Oregon, Miller killed a homosexual man who made sexual advances toward him. According to Miller, the man attempted to prevent him from forming a relationship with "the only woman in his life that really cared about him and that he felt that he loved." Miller also informed Dr. Caddy that he spent a period of time in a Texas prison where he almost died because he was

placed in solitary confinement for several weeks without food or water. In addition, Miller was purportedly attacked by another prisoner who hit him on the back of the head with the blunt end of a pickaxe.

In rebuttal, the State presented Dr. Waldman who testified that Dr. Caddy's testimony regarding Miller's extensive history of sexual abuse was not reflected in the record. Dr. Waldman noted that Miller's stories of his injuries and his past often varied from person to person:

> DR. WALDMAN: [T]here's stories he tells about working on a yacht and having sex with [someone's] wife—excuse me. That, I never heard before. He talks about being hit on the head with a pick axe. That, I never heard before. There's a statement in a couple of entries in Oregon where he said he got hit with a piece of metal in the mid sixties, but not a pick axe. It says in Dr. Caddy's report that he got kicked by a horse, and that's why he has low back problems.
>
> STATE: Did you see that contradicted in any of his records?
>
> . . . .
>
> DR. WALDMAN: [Yes.] That he had a motorcycle accident and that's why he had low back problems. I never saw anywhere in a large amount of documents anything about being hit with a pick axe, kicked by a horse, [] raped in Texas, beat in Texas, run over by tractors or chipping devices. I never saw any reference to that.

In fact, one of Miller's experts, Dr. Wood, testified during the evidentiary hearing that he did not rely on Miller's social history because he believed that Miller was

intentionally providing false information, and that Miller's story was full of "confabulation and rather wild assertions."[5]

We conclude that trial counsel conducted a reasonable investigation into available mitigation. Miller specifically directed his trial counsel to present only a limited amount of mitigation with the goal of securing some "life votes," but not enough to convince a majority of the jury to recommend a life sentence. Consistent with this request, defense counsel hired a mitigation specialist who travelled to multiple states to collect information with regard to Miller's life and background. Two expert witnesses presented testimony describing how Miller's background contributed to his diagnoses of polysubstance dependence and antisocial personality disorder, and his diminished mental functioning. Further, there is no evidence in the record that Miller, despite being evaluated by Dr. Mings, Dr. Edwards, and Dr. Danziger before the penalty phase, disclosed to anyone the "deep trauma, deprivation and abuse" he described to Dr. Caddy during the postconviction proceedings. By failing to disclose the purportedly pervasive abuse and other traumatic aspects of his social history during the trial proceedings,

---

5. In addition to the reasons previously discussed, we have significant concerns regarding the completeness and accuracy of Dr. Caddy's testimony with regard to Miller's social history in light of the fact that Miller: (1) previously indicated that his goal was to prolong his appellate proceedings as long as possible; and (2) is the only source upon which Dr. Caddy relied to evaluate the particularly traumatic portions of Miller's background.

Miller cannot now complain that trial counsel unreasonably failed to pursue or present such mitigation. See Stewart v. State, 801 So. 2d 59, 67 (Fla. 2001). Counsel reasonably investigated and presented available mitigation regarding Miller's social history and we affirm the denial of this claim.

**Failure to Obtain a PET Scan**

Miller next alleges that trial counsel performed deficiently by failing to obtain a PET scan to demonstrate that he suffers from significant mental deficiencies that prevented him from knowingly, intelligently, and voluntarily waiving his Miranda rights. Miller asserts that counsel should have been aware of his diminished mental functioning due to behavioral variant frontotemporal dementia, other neuropsychological impairments, and ongoing substance abuse.

Approximately three days after the murder, Miller was arrested and transported to the Orlando Police Station. Miller, 42 So. 3d at 211. Prior to the interrogation, Miller informed law enforcement that "for the first time in his life" he wanted to speak with the police and asked if he could have a single jail cell and his cellular phone. Id. at 220. After he was escorted to an interrogation room, a law enforcement officer read Miller his Miranda rights from the standard card used by the Orlando Police Department. Id. After Miller affirmed that he understood these rights, he waived them and confessed to stabbing Smith and Haydon. Id.

- 24 -

Miller subsequently moved to suppress the confession, but the motion was denied by the trial court. Id.

During the pretrial proceedings, trial counsel retained two experts who evaluated Miller neurologically and determined that he was competent to proceed to trial. Dr. Mings testified during the evidentiary hearing that when he evaluated Miller pretrial, he determined that Miller had a full-scale IQ of 102, which is within the average range, and Miller also "did quite well on [the memory test, which] was consistent with his general intellectual ability." Dr. Mings testified that he did not see any "gross impairment" with respect to Miller's semantic memory skills, and noted that Miller scored in the average range on the Wisconsin Card Sorting Test. He otherwise scored average or slightly below average on the remaining tests except the Rey-Osterrieth Complex Figure test, a visual-spatial memory test, where he demonstrated mild problems in completing the test. Ultimately, Dr. Mings concluded Miller exhibited some mild decline in general intellect, but did not demonstrate any gross neurological impairments.

Henderson testified during the evidentiary hearing that both Dr. Mings and Dr. Danziger recommended that the defense order neuroimaging before trial. Dr. Danziger believed that neuroimaging was necessary because Miller was suffering from "mild deficits, probably in his frontal lobe in his cognitive process[, a]nd that it would probably not rise to the level of a substantial impairment, but there was

some impairment." As a result, Henderson consulted with a neurologist regarding whether an MRI or a PET scan would provide the best results. Henderson decided to obtain an MRI after the neurologist informed him that a PET scan would likely not be productive.[6] Dr. Mings concluded that the results of the MRI were "unremarkable except for a shrinkage of the left hippocampal, which . . . might be associated with memory abilities, particularly verbal memory abilities."

During the evidentiary hearing, Dr. Wood, a neuropsychologist, testified that he reviewed the reports of Dr. Sadler, the radiologist who administered Miller's MRI in 2007, and Dr. Cambridge, another radiologist. Dr. Wood testified that Dr. Sadler found two abnormalities in Miller's brain, hippocampal sclerosis, which Dr. Wood testified is the scarring or shrinking of brain matter, and Virchow-Robin spaces. He testified that these abnormalities are commonly found in the early stages of dementia. Dr. Wood also testified that Dr. Cambridge determined that Miller was suffering from mild, but immediate short-term and long-term memory deficits. Dr. Wood noted that Dr. Cambridge also found there was no evidence from the 2007 MRI of acquired brain damage. Dr. Wood concluded that the MRI showed evidence of brain atrophy that was within the normal range.

---

6. Henderson testified that he chose the MRI because: (1) Miller had previously obtained an MRI and was familiar with the procedure; and (2) the PET scan, which requires the injection of radioactive material, would have been more invasive to Miller, who was fifty-nine years old at the time.

Dr. Wood reviewed the results of a PET scan conducted during the postconviction proceedings, and concluded that it demonstrated atrophy "well into the abnormal range," and that the peak measure of Miller's anterior cingulate cortex and orbitofrontal cortex fell below the first percentile. Ultimately, Dr. Wood concluded it was probable that Miller was suffering from behavioral variant frontotemporal dementia, a disease characterized by behavioral symptoms of social dysfunction and apathy. Dr. Wood further opined that Miller has:

> declining metabolism in the frontal areas, specially. That he has atrophy outside normal limits for his age and that his behavior has also declined rather substantially, to the extent that I know he must have had these symptoms in 2006 and '07. . . . Not only did he have hippocampal sclerosis and memory problems in the 2006, 2007, area, in my opinion, his behavior was not fully normal then either. I'm satisfied then to say that he was already substantially under the influence of this disease.[7]

Based on this diagnosis, Dr. Wood concluded that Miller committed the murder while he was under the influence of an extreme emotional or mental disturbance, and that he was incapable of conforming his conduct to the requirements of law, two statutory mitigating circumstances.

---

7. Similarly, Dr. Caddy testified that Miller had "impaired brain function and that it is likely that his brain functioning has deteriorated abnormally over time and probably as a direct consequence of the impact of the substances that he has used, especially the inhalants."

Dr. Waldman, an expert in neuropsychology and cognitive neurology who testified for the State, disagreed with Dr. Wood's diagnosis of behavioral variant frontotemporal dementia because he saw none of the symptoms generally associated with the disease, such as a gross personality change from a previous level. There was no cognitive or motor perseveration, apathy, hypertrophy, occupation with eating and putting things in his mouth, or loss of ability to abstract. Instead, Dr. Waldman testified that the record reflects that <u>shortly after the crime</u> Miller presented himself appropriately, was well organized, and was coherent in both written and oral communications. According to Dr. Waldman, this behavior demonstrated that Miller was able to use his memory to draw inferences and reach conclusions, and also that Miller was concerned about the outcome of the trial and actively involved in his defense.[8] Thus, Dr. Waldman concluded that Miller did not demonstrate significant impairments in frontal lobe functioning prior to trial.

---

8. This conclusion was supported by the testimony of Joni Johnston, Miller's mitigation specialist, and Hooper. Johnston testified that she interacted with Miller during the pretrial proceedings and that Miller "presented to me as intelligent, calm. . . . [H]e knew exactly what he wanted, how he wanted to proceed." She explained that his social skills were "acceptable. . . . He interacted with me in a polite manner." Johnston testified that she did not observe any cognitive deficits in Miller, but instead found him to be "quite intelligent." Similarly, Hooper testified that Miller was articulate, intelligent, and aware.

Finally, Dr. Waldman reviewed Miller's 2007 MRI scan and Dr. Cambridge's and Dr. Sadler's reports. Dr. Waldman explained that hippocampal sclerosis may be an early sign of a dementia-type syndrome or disease, but that it would primarily affect short-term memory. He testified that with regard to Miller, "[t]here is a little bit of temporal lobe atrophy bilaterally," but explained that "it's not consistent with frontotemporal dementia" and "[t]here isn't a degradation of whole lobes of this brain." Finally, Dr. Waldman explained that there was nothing noteworthy about Miller's ventricle to brain ratio, and concluded that "the metabolism shown in that PET scan was not consistent with a medical diagnosis of frontotemporal dementia."

**Miranda**

Before addressing the merits of this claim, we note that it is procedurally barred. On direct appeal, we rejected Miller's claim that the trial court erred when it denied the motion to suppress his confession on the basis that the officers who conducted the interrogation failed to advise him that he had the right to appointed counsel during questioning. Id. at 219-20. Miller now attempts to relitigate the voluntariness of his confession on the basis that evidence of his mental impairments and substance abuse was not uncovered until the postconviction proceedings. Since the voluntariness of Miller's confession was addressed and rejected by this Court on direct appeal, he cannot now relitigate a substantially

similar claim under the guise of ineffective assistance of counsel.  See Freeman v. State, 761 So. 2d 1055, 1067 (Fla. 2000).

Even if we were to conclude that this claim of ineffectiveness was not procedurally barred, which we do not, this claim lacks merit.  In affirming the denial of the motion to suppress on direct appeal, we concluded that Miller fully understood his Miranda rights:

> Miller has prior experience with the law and exposure to the Miranda warnings.  "The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights."  Coyote v. United States, 380 F.2d 305, 308 (10th Cir. 1967).  Miller's background and knowledge of law enforcement demonstrate that he understood the warnings with regard to his rights.  In fact, he expressly stated to law enforcement that he normally would not talk to police and would first to talk to an attorney, but was going to "do something that he had never done before."  Thus, Miller expressed a willingness to talk that was premised on his prior understanding that he had a right to an attorney, which is a right he normally utilized.  When the warnings given to Miller are considered in context with his age, background, and intelligence, they imparted a "clear, understandable warning of all of his rights."  Coyote, 380 F.2d at 308.

Miller, 42 So. 3d at 223.  This conclusion is supported by the mental health experts' evaluations of Miller, none of whom concluded that the results of the MRI or their neurological evaluations indicated that his neurological impairments prohibited him from making a knowing, voluntary, and intelligent waiver of his Miranda rights.  In fact, Dr. Mings testified during the evidentiary hearing that the defense specifically retained him to determine whether Miller was competent to

waive his <u>Miranda</u> rights.  Dr. Mings conducted an "Assessing, Understanding, and Appreciation of <u>Miranda</u> Rights" questionnaire and determined that Miller "made very few, if any, errors on that.  He understood all of the questions, [and] answered them appropriately."  Similarly, Dr. Waldman testified that Miller's oral and written communications before trial demonstrated that Miller was able to rely on his memory to make cogent arguments and actively participate in his defense.  As a result, Hooper testified that competency to waive <u>Miranda</u> rights was not an issue in the case because Miller did not have "any doctor at that point give any opinion that he wasn't competent to waive <u>Miranda</u>, and certainly didn't give me any indication that he had any competency problems at all."

Although Miller has now discovered experts who are willing to testify that he is currently suffering from behavioral variant frontotemporal dementia, neither expert could offer a conclusion as to how much of Miller's current neurological condition can be attributed to deterioration that has occurred in the five-and-a-half years since trial.  Specifically, Dr. Caddy was asked:

> STATE:  Okay.  And you really can't offer a firm and reliable conclusion on how much of his present condition is due to deterioration in the five and a half years since the time of the trial, can you?

> DR. CADDY:  I would agree with that, yes.  You're right.  I cannot do that.

> STATE:  And at the present time, you found, basically, from what I understand mild impairment in your testing?

DR. CADDY:  Mild but significant.  Still in the pathological range.

The foregoing facts demonstrate that: (1) trial counsel thoroughly investigated the possibility that Miller's purported neurological impairments, memory deficits, and substance abuse problems may have interfered with his ability to knowingly, voluntarily, and intelligently waive his Miranda rights and determined that they did not; and (2) Miller has failed to present any evidence to contradict our conclusion on direct appeal that Miller clearly understood and waived his Miranda rights.  Further, trial counsel reasonably relied on Dr. Mings' and Dr. Danziger's professional opinions regarding neuroimaging that it was not necessary for Miller to undergo a PET scan.  Buzia v. State, 82 So. 3d 784, 791 (Fla. 2011) (holding counsel's reliance on expert's opinion that capital murder defendant had no indication or history of cognitive impairment and that no further neurological testing was required did not constitute deficient performance).  Accordingly, we hold that because it is evident Miller has failed to demonstrate deficient performance, this Court need not address the prejudice prong of Strickland.  See Mungin, 932 So. 2d at 996.  The postconviction court did not err in denying this claim.

**Statutory Mitigating Circumstances**

Miller contends that counsel were ineffective for failing to obtain a PET scan before trial, which purportedly would have demonstrated that he suffered

from behavioral variant frontotemporal dementia.  Miller contends that this debilitating and progressive disease would have established two statutory mitigators that were not presented during the penalty phase.  Thus, Miller claims, had a PET scan been conducted before trial, the jury would have weighed this mitigation in combination with Miller's history of trauma and drug abuse.

Without addressing deficiency, we conclude that Miller has failed to establish prejudice.  See id.  In the context of penalty phase errors, prejudice is established when the defendant can demonstrate that "absent the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different or the deficiencies substantially impair confidence in the outcome of the proceedings."  Simmons, 105 So. 3d at 503 (quoting Hoskins v. State, 75 So. 3d 250, 254 (Fla. 2011)).  To assess whether there is a reasonable probability that counsel's performance prejudicially impacted the penalty phase proceedings, this Court evaluates the totality of the mitigation evidence presented both during trial and the postconviction proceedings, and reweighs it against the established aggravation.  Id.

The jury recommended a sentence of death by a vote of eleven to one, and the trial court found five aggravating circumstances—including, among others, HAC and prior violent felony, which are two of the weightiest aggravating circumstances in Florida's capital sentencing scheme—and gave all five great

weight.  Miller, 42 So. 3d at 212; see also Hodges v. State, 55 So. 3d 515, 542 (Fla. 2010) ("Qualitatively, prior violent felony and HAC are among the weightiest aggravators set out in the statutory sentencing scheme.").  In comparison, the mitigation presented was relatively minor.  The trial court found zero statutory mitigating circumstances, and only six nonstatutory mitigating circumstances, none of which received more than "some weight."  Id.

Miller claims that Dr. Wood's evidentiary hearing testimony and diagnosis of behavioral variant frontotemporal dementia demonstrate that two statutory mitigating circumstances—extreme mental or emotional disturbance, and inability to conform one's conduct to the requirements of law—would have been established if his testimony had been presented during the penalty phase.  Dr. Wood's diagnosis indicates that Miller is currently suffering from a mild, but significant and progressive brain impairment.  However, neither Dr. Wood nor Dr. Caddy could quantify how much Miller's brain had deteriorated between the time of the murder and the time of his 2011 PET scan.  Instead, the record demonstrates that Miller's mental condition around the time of the murder was substantially investigated by multiple mental health experts who informed trial counsel that he did not suffer from any major cognitive impairments.  Additionally, during the postconviction proceedings, Dr. Wood's conclusion that Miller exhibited frontotemporal dementia in 2007 was disputed by Dr. Waldman, who testified that

- 34 -

Miller was not, and is not currently, suffering from frontotemporal dementia. Dr. Waldman's conclusion is supported by record evidence demonstrating that Miller exhibited organized and cogent behavior in his written and oral communications shortly before trial.

Furthermore, Dr. Wood's testimony during the evidentiary hearing that Miller met the criteria for two statutory mitigating circumstances was directly refuted by the penalty phase testimony of Dr. Danziger. During the penalty phase, Dr. Danziger concluded that Miller did not commit the murder under an extreme mental or emotional disturbance, specifically stating that:

> extreme would be somebody who was extremely psychotic, responding to hallucinations, suffering from some sort of delusion or paranoid beliefs, suffering from some sort of extreme mania, that there was some active major mental illness that significantly impacted on their behavior. Antisocial personality disorder, in my opinion, is more of a lifelong character pathology. I would not view that as resulting in an extreme state of emotional disturbance.

Dr. Danziger further testified that Miller's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was not substantially impaired at the time of the murder. Thus, had Miller presented Dr. Wood's testimony regarding the presence of statutory mitigation during the penalty phase, that testimony would have been refuted by the testimony of Dr. Danziger.

In sum, neither Dr. Wood nor Dr. Caddy were able to quantify how much Miller's brain has deteriorated since the time of the murder. Dr. Wood's

conclusion that Miller suffered from frontotemporal dementia, both currently and at the time of the murder, was refuted by the testimony of Dr. Waldman. Miller has failed to rebut evidence that demonstrates he possessed sufficient mental acuity to actively and intelligently participate in his defense. Finally, Dr. Wood's conclusion during the postconviction proceedings that Miller's mental impairments established the applicability of two statutory mitigating circumstances was directly refuted by a mental health expert who evaluated Miller shortly after the murder and testified during the penalty phase that the statutory mitigating circumstances were not applicable. Thus, we conclude that Miller has failed to establish that had Dr. Wood's testimony been presented during the penalty phase the outcome probably would have been different, and our confidence in his sentence of death has not been undermined. We affirm the denial of this claim.

## **Brady, Giglio, and Conflict of Interest**

David Dempsey, who was Miller's roommate and friend at the time of the murder, testified during trial that he and Miller stopped at the victim's house and spoke with the victim for approximately thirty minutes. Miller, 42 So. 3d at 210. During that conversation, Miller and Dempsey noticed that the victim wore a substantial amount of jewelry and appeared to suffer from pronounced memory lapses. Dempsey was asked by the prosecutor what he and Miller discussed in the car after they left the victim's house, to which he responded:

DEMPSEY:  When we—when we pulled off from—from talking to her, um, he made a—a statement about how, you know, she—she didn't know what she was doing and, um, he would be—he said that he would be able to come back there and—and just—she just wanted to talk to people is what he said.  He said, I could come back there and just talk to her any time and work my way into the house and rob her.

STATE:  Did you say anything to him when he said that?

DEMPSEY:  I told him that I didn't want to hear anything about it.  I mean, I'm not a perfect person, but I don't rob people.

After that statement, Dempsey informed the jury he had been convicted of "four to six" felonies, the majority of which were either grand theft auto or possession of cocaine.  He further testified that he was on probation for dealing in stolen property, and that he had recently violated his probation for failing a drug test.

In this claim, Miller presents ineffective assistance claims under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), and conflict of interest claims.  Specifically, he alleges that Dempsey lied to the jury when he testified that he does not "rob people."  Miller contends that shortly before testifying, Dempsey became violent with his mother and stole her car.  He alleges that counsel performed deficiently when they failed to uncover and utilize this incident to further impeach Dempsey, and that an actual conflict of interest prevented counsel from fully investigating Dempsey's background.  He also asserts that the State actively withheld this information and knowingly failed to correct Dempsey's testimony that he did not commit robberies.

## Evidence Presented During the Evidentiary Hearing

During the evidentiary hearing, Miller presented several witnesses to support these allegations. Janice Dempsey, Dempsey's mother, testified that during the fall of 2007, her son was living in her home while serving probation for stealing her personal belongings. One afternoon, Dempsey demanded money from her and attempted to drive her car without permission. Dempsey's mother testified that although she and Dempsey engaged in a "tug-of-war" for the keys, Dempsey did not attempt to strike or harm her. Eventually, she released the keys and called the police, who refused to assist her. Dempsey's mother testified that she vaguely remembered contacting Dempsey's probation officer about the incident, but could not remember the details of the conversation because the argument was not a "big incident" in her life. Similarly, Dempsey testified that he remembered engaging in verbal arguments with his mother over his use of her vehicle, but he testified that he never physically attacked his mother or engaged in a "tug-of-war" with her over the car keys.

Finally, Deborah Hood, who lived with Miller and Dempsey before the murder, testified that she chased him out of her house with a baseball bat on multiple occasions because Dempsey would often take money and drugs from her without her permission. However, during cross-examination, Hood testified that she never contacted the police regarding Dempsey's behavior and could not

specifically remember when or why she attacked Dempsey.  Rather, Hood testified that during this time she, Miller, and Dempsey were frequently using drugs, and she was consuming drugs around the times that she attacked Dempsey.  After the murder, Hood moved to Michigan, and did not make any attempt to notify authorities in Florida that she had moved, and testified that it would have been difficult to find her during that period of time.

### **Strickland, Brady, and Giglio**

Miller established during the evidentiary hearing that Dempsey was on probation and living at his mother's house shortly after the murder.  At some point between the murder and Miller's trial, Dempsey had a disagreement with his mother, during which Dempsey demanded money and attempted to take her car keys.  This evidence did not form the basis for a probation violation, nor does it constitute a robbery.[9]  It proves only that Dempsey and his mother had a disagreement, which, according to Dempsey, happened frequently.  As the postconviction court noted, evidence of this "robbery" would more than likely not have been admissible during trial because it did not result in a conviction and was not material or relevant to the murder.

---

9. According to a DOC probation officer, Dempsey's probation records reflected that he had committed three violations, but they did not include a violation for the incident reported by his mother.

Moreover, Miller does not dispute that he acted alone when he murdered the victim. Therefore, the evidence of Dempsey's disagreement with his mother, if presented during trial, would demonstrate only that: (1) his statement as to why he did not assist Miller in robbing the victim was untrue; and (2) Dempsey had previously committed felonies, a fact that he readily admitted during trial. Furthermore, even if Dempsey had not testified during trial, substantial and compelling evidence, including Miller's confession, and physical evidence linking Miller to the murder, definitively establishes that Miller murdered the victim. See Miller, 42 So. 3d at 227-28. Thus, the value of this evidence was at best minimal, and would have in no way prejudicially impacted or undermined confidence in the outcome of the guilt phase. Thus, Miller has failed to demonstrate that his counsel were ineffective.

Miller has also failed to establish the materiality prong of both Brady and Giglio and has also made no attempt to establish that this evidence was willfully or inadvertently suppressed by the State, or that the prosecutor knew that Dempsey's trial testimony was false. See Kilgore v. State, 55 So. 3d 487, 506-07 (Fla. 2010) ("To establish a Brady violation, the defendant has the burden to show (1) that favorable evidence—either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced."); Guzman v. State, 868 So. 2d 498, 505 (Fla. 2003)

("To establish a <u>Giglio</u> violation, it must be shown that: (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material."). Accordingly, we affirm the postconviction court's denial of the <u>Strickland</u>, <u>Brady</u>, and <u>Giglio</u> portions of this claim, and hold that counsel did not perform ineffectively.

## Conflict of Interest

Miller next alleges that because the Office of the Public Defender was actively representing both Dempsey and Miller at the same time, defense counsel did not thoroughly investigate Dempsey's background or the evidence previously discussed concerning Dempsey's purported robbery of his mother.

The potential conflict of interest was discussed during a November 28, 2006, status hearing. Miller's counsel informed the trial court that they intended to depose Dempsey, and mentioned that he had been previously represented by other attorneys in the public defender's office on unrelated charges. Counsel informed the trial court that they had not previous represented Dempsey, and did not access Dempsey's closed file or his confidential communications with counsel. Counsel advised the court that they had discussed this issue with Miller, who stated that he was willing to waive any conflict of interest claim. Later in the hearing, the court asked Miller whether he approved of his counsel's continued representation despite the potential conflict. Miller responded that he had discussed this potential conflict

of interest and he wished for his counsel to continue to represent him.

The right to effective assistance of counsel encompasses the right to representation free from actual conflict. See Hunter v. State, 817 So. 2d 786, 791 (Fla. 2002). However, a defendant may waive the right to conflict-free counsel, and this waiver will be affirmed when the record indicates that a defendant: (1) was aware of the conflict of interest; (2) realized the conflict could affect the defense; and (3) knew of the right to obtain other counsel. McWatters v. State, 36 So. 3d 613, 635 (Fla. 2010). During the November 28 hearing, Miller specifically indicated he was aware that the public defender's office had previously represented Dempsey. He was informed that his counsel could, but would not, access the confidential records and communications between Dempsey and his prior counsel. Finally, Miller addressed the trial court and confirmed that he understood he could object to continued representation by the public defender's office, but wished to retain his current counsel.

Accordingly, we conclude that Miller waived his ability to assert that his counsel labored under an actual conflict of interest, and affirm the postconviction court's denial of this claim.

**Allegedly Improper Comments and Instructions**

Miller's next claim contains four subparts. First, he alleges that trial counsel were ineffective when they failed to object to improper comments of both the trial

court and the prosecutor during voir dire. Next, Miller alleges that the prosecutor misstated the law during opening and closing statements. Third, Miller alleges that trial counsel were ineffective when they failed to present an opening statement. Finally, Miller alleges that the trial court improperly instructed the jury at the close of the penalty phase. Before addressing the merits of these claims, we note that they are procedurally barred, as these claims could and should have been raised on direct appeal. See Garcia v. State, 949 So. 2d 980, 990 (Fla. 2006).

**Jury Selection**

Miller contends that the prosecutor and the trial court improperly informed three jurors who served on the jury that they were required to vote for a sentence of death under certain circumstances.[10] Immediately before the venire was questioned, the trial court instructed:

> Caution, every one of us have ideas and notions about certain things. We have ideas and notions about the death penalty. Some of us have ideas when it should be applied, some of us have ideas when it should not be applied. What we're gonna simply ask, and some people can do it and some people can't do it, to lay aside any of your personal

_____

10. Miller also alleges that improper comments were made by the trial court and the prosecutor to five additional members of the venire. However, each juror was questioned individually by the trial court and the parties away from the rest of the panel, and none of these potential jurors served on the jury. Miller presents no evidence that these jurors communicated with other potential jurors or tainted the jury pool in any way. Accordingly, because Miller has failed to demonstrate how counsels' failure to object to the comments made to these five jurors undermines confidence in his sentence of death, we affirm the postconviction court's denial of relief relating to these potential jurors.

opinions about the death penalty and, if we get to that point, make whatever decision you make solely on the law that I'll give you and the facts in evidence.

We reiterate that we review this claim of ineffectiveness in light of Miller's instruction to trial counsel that if he were convicted, he wanted counsel to strategically approach the penalty phase with the intention of securing a non-unanimous death recommendation.

Juror Number 43

During voir dire, the prosecutor asked juror 43 whether there was a risk that his religious beliefs would interfere with his ability to follow the law and, if appropriate, vote for a sentence of death. The juror responded that the question was difficult to answer in the abstract, but he believed he would have difficulty setting aside his religious beliefs to vote for a sentence of death. The prosecutor then stated:

> PROSECUTOR: All right. And you feel that you can't commit to setting aside your religious beliefs and just deciding this based on the law?
>
> JUROR 43: I think that I can do that. I thought the question was whether it would be more difficult to do so.
>
> PROSECUTOR: Well, by difficult, I mean that it actually might prevent you? In other words, if you're saying I'm going to weigh the law, let me check the box for death because the aggravators outweigh the mitigators and there's no conscience there, you're just objectively doing that, it's really easy to make that check. What I'm asking you is—well, I know I have to make the check under the law, I have these religious beliefs, but I have to follow the law, it's harder to do because

you're doing that, but you've said I'm strong, I have to set aside those religious beliefs, I'm not going to incorporate those religious beliefs for me to vote a way that may be contrary to the law, and my question is—to you, is there a chance, even a small one, that you may vote contrary to the law or the State, you may give less weight to the aggravators because consciously you don't want to vote for it because of those religious beliefs?

JUROR 43: No. I think notwithstanding the increased difficulty, um, I believe I could faithfully adhere to the law in that regard.

(Emphasis supplied.) Miller asserts that the prosecutor attempted to mislead juror number 43 into believing that the penalty phase involved only a strict weighing of aggravating and mitigating circumstances. He contends that counsel should have objected to the emphasized statement above and requested that this juror be correctly instructed by the court that he could dispense mercy and impose life regardless of the weighing process. Miller, however, presents no legal authority as to how the prosecutor's comment, in context, undermines confidence in the outcome of his sentence.

Furthermore, because the juror initially had difficulty understanding the prosecutor's question, the challenged comments occurred when the prosecutor attempted to clarify whether the juror could put aside his religious beliefs about the death penalty and make his decision based solely on his ability to follow the trial court's instruction to consider only the evidence presented and to impartially apply the law. Given the trial court's previous instruction and the juror's response to the questions, we conclude that the prosecutor did not mislead juror 43 into believing

- 45 -

that he could not serve on the jury unless he was prepared to vote for a death sentence if the aggravating circumstances outweighed the mitigating circumstances. These comments were no more improper than those in <u>Jones v. State</u>, 845 So. 2d 55, 67 (Fla. 2003), where we held that trial counsel did not perform ineffectively when he failed to object to the prosecutor's questions regarding whether the prospective jurors could recommend the death penalty, "if the facts, circumstances, and the law warrant it." Accordingly, we affirm the denial of relief with respect to this juror.

Juror Number 268

During voir dire, juror 268 was asked whether she had previously thought about the death penalty, to which she responded:

> JUROR 268: It's crossed my mind a couple of times but it's not something that like I am, oh, my god. . . . It's not something that like I really I'm so super against or I'm so super for. It's one of those things where if the evidence could prove or like, okay, it is a possibility of either DNA or some little missing piece that could say, oh, well, he actually didn't do it or she didn't do it, then that's when I kind of lean for the whole life without parole.

> PROSECUTOR: Right.

> JUROR 268: But if it's the other way—

> PROSECUTOR: All right. The question of death penalty won't come about in the first segment of the trial unless he's convicted for first degree murder. Okay. So the person is convicted of first degree murder. Then you have a decision to make. And the way that it works under our laws is the State presents certain aggravators, so things that are in support of the death penalty under the law and then

- 46 -

defense presents what are known as mitigators, things for you to consider, and defendant's background, maybe some psychologists or psychiatrists, those kind of evidence and, again, it's not limited to that. But essentially that's how it works. And then you make a decision whether the act—you know, you'll weigh the two. We don't tell you what weight to give anything. <u>But if the aggravators in—in— in this particular case are not outweighed by the mitigators, the aggravators should be given greater weight, could you vote for death and follow the law?</u> Speak up.

JUROR 268: I could.

PROSECUTOR: And if, in fact, you felt that the mitigators, in fact, did outweigh the aggravators and the death penalty wasn't warranted, could you vote for a life sentence, life without possibility of parole?

JUROR 268: Yes.

(Emphasis supplied.) Later, defense counsel explained:

So there are factors that you would be instructed on, like [the prosecutor] said, reasons to impose the death penalty and reasons not to impose the death penalty, aggravators and mitigators. And with the aggravators, the reasons are given to people just by imposition of the death penalty, those are limited, those are limited by the statute, those are very, very—things you can consider and you can't go outside the list. . . . The list is finite, for lack of a better word. It's just a very specific list of considerations. And it's not a factor or it's not a process of finding one of those things. It's a process of first seeing if the State proves that this consideration exists and then you are free to weigh it however you want to weigh it. And the same with the mitigation. . . . The things that you see in mitigation, if you find that they exist as a matter of fact, then you're free to weigh those things however it is that you want to weigh them; do you think you can do that?

Miller contends that counsel performed deficiently when they failed to object to

the prosecutor's statement that if the aggravating circumstances are not outweighed

by the mitigating circumstances, then the juror should vote for death. He further contends that counsel failed to ensure the juror was clearly instructed that in the event of a penalty phase, life was an option regardless of the weight of any aggravating and mitigating circumstances established. Again, Miller provides no legal authority to support his allegation that the prosecutor's comments were improper.

Miller's claim of prosecutorial impropriety fails for two reasons. First, the statement that the mitigating circumstances must outweigh the aggravating circumstances is consistent with both the standard advisory sentence jury instruction and section 921.141(2), Florida Statutes (2002), which provides:

> After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based upon the following matters:
>
> (a) Whether sufficient aggravating circumstances exist as enumerated in subsection (5);
>
> (b) Whether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist; and
>
> (c) Based on these considerations, whether the defendant should be sentenced to life imprisonment or death.

(Emphasis supplied); see also Fla. Std. Jury. Instr. (Crim.) Homicide 7.11 ("Should you find sufficient aggravating circumstances do exist to justify recommending the imposition of the death penalty, it will then be your duty to determine whether the mitigating circumstances outweigh the aggravating circumstances that you find to

- 48 -

exist.") (emphasis supplied).  Second, the previously quoted portion of voir dire reflects that both the prosecutor and the defense explained to juror 268 how bifurcated capital proceedings operate, and addressed whether juror 268 could understand and follow these procedures.  Juror 268 indicated that she understood these procedures and could apply the law fairly and impartially.  Nothing in the prosecutor's comments misled juror 268 into believing that she could not serve on the jury unless she were prepared to vote for a death sentence.

Juror 275

During voir dire, the prosecutor asked juror 275 the following:

PROSECUTOR:  [L]et's say you're back there and I guess you've indicated that you're following some cases and you've kind of made your own and, of course, that's just based on the media's portrayal, it's not based on sitting there, which is entirely different.  Let's say you get in a situation where, of course, the only time the death penalty would be a factor is if the jury has convicted of first degree murder.  So assuming that that's happened and we're at the next phase, what if the Court gives you instructions, you understand the instructions, you weigh the aggravators and mitigators, clearly to you, in making that objective determination, the aggravators clearly outweigh the mitigators, but there is some mitigation there that you can see or that's been articulated and just your gut is that you don't want to do it in that situation, even though if the reading of the law, you were to follow the law, it would be absolutely that you would vote for death, because the aggravators clearly outweigh the mitigators, but your situation you don't feel right about doing it or don't want to do it, how would you resolve that conflict?

JUROR 275:  Um, well, it would be, you know, a tough decision to make.  Nobody wants to be put into that sort of position.  But—if I had to make that decision, um, I suppose I would—I would have to

- 49 -

follow the instructions of the jury—of the judge and—and go with—go with that as my guidance in making my decision.

(Emphasis supplied.) Despite the prosecutor's inarticulate "absolutely" comment, the juror was informed immediately thereafter by the defense that:

> The law is never going to require that you recommend to the judge that there be a death penalty for punishment nor will it require that you recommend a life without possibility of parole. It's a weighing process, once you redo the calculation, whatever you attribute to it, that's the recommendation as to the punishment you're supposed to come up with.

(Emphasis supplied.) Further, shortly before either party questioned the juror, the trial court explained that the jury would "be instructed to look at certain aggravating factors and certain mitigating factors. How you weigh them is left up to you and you alone."

We conclude that counsel did not perform deficiently when they failed to object to the "absolutely" statement. The prosecutor did not inform the juror that she had an "absolute" duty to vote for a sentence of death, and defense counsel immediately informed the juror that the law will never require a recommendation of death. Furthermore, on multiple occasions, juror 275 indicated that she would follow the instructions of the trial judge and would consider and weigh the aggravating and mitigating circumstances in determining whether a sentence of death was appropriate. Thus, in addition to the trial court's and defense counsel's

- 50 -

instructions, the juror's responses confirm that she understood the law and her role as a potential juror.

Accordingly, we affirm the postconviction court's findings that these jurors were properly instructed on the law, and conclude that counsel did not perform ineffectively when they failed to object to these statements.

**Prosecutor's Opening and Closing Statements**

In Florida, wide latitude is permitted in presenting opening and closing statements to a jury, and comments by the prosecutor will merit a mistrial only when they deprive the defendant of a fair and impartial trial, materially contribute to the conviction, are so harmful or fundamentally tainted as to require a new trial, or are so inflammatory they might have influenced the jury to reach a more severe verdict than it would have otherwise rendered. Spencer v. State, 645 So. 2d 377, 383 (Fla. 1994); see also Dessaure v. State, 891 So. 2d 455, 464-65 (Fla. 2004) ("An order granting mistrial is required only when the error upon which it rests is so prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that the defendant receives a fair trial.").

Miller contends that his counsel were ineffective for failing to object or move for a mistrial when the prosecutor, during penalty phase opening statements, informed the jury:

> [T]he State's quite confident that you will find th[e] aggravating factors far outweigh his background, that may not have been the best

childhood, but the State is quite confident that you will find that they far outweigh the circumstances of his childhood and his adult life and obviously his addiction, you've already heard about, the State is quite confident that you will find there's only one penalty that is appropriate for this case, and that is the ultimate sanction in this state, the death penalty.

Miller alleges that the prosecutor used this statement as a conduit to continue to misinform the jury that death was the only appropriate sentence where the aggravating circumstances outweigh the mitigating circumstances.

As noted by the postconviction court in its order denying this claim, this statement constituted a synopsis of the evidence the State intended to present during the penalty phase, and the reasonable inferences that could be drawn from that evidence. See Perez v. State, 919 So. 2d 347, 363 (Fla. 2005) (noting that the purpose of opening statements is for the parties to convey to the jury what they expect to be established by the evidence presented during trial). The State did not suggest that death was the only penalty available for the jurors to impose, but rather argued that it was the only appropriate penalty given the evidence it intended to present. Miller has failed to demonstrate that the statements at issue were erroneous, misleading, or made in bad faith, and the prosecutor made the comments fully expecting that they would be established by the evidence to be presented during trial. We conclude that these remarks did not deprive Miller of a fair and impartial trial, did not materially contribute to his sentence of death, were not so harmful or fundamentally tainted as to require a new trial, and were not so

- 52 -

inflammatory they might have influenced the jury to reach a more severe verdict than it would have otherwise rendered. See Spencer, 645 So. 2d at 383.

Miller additionally alleges that during closing statements, the prosecutor again misinformed the jurors that they were required to recommend death if the aggravating circumstances outweighed the mitigating circumstances by stating, "remember back on jury selection—because all of you were brought over to that corner of the room and talked about following the law in this case and whether or not you could follow the law." However, because the prosecutor did not misinform the jurors during voir dire, we conclude that the prosecutor's request was not improper, and we affirm the postconviction court's denial of this claim.

### Defense Counsel's Waiver of Opening Statements

Miller next alleges that defense counsel were ineffective when they failed to inform the jury during opening statements that the weighing process was not stringent and inflexible, and that a juror could always vote for life. However, Miller did not elicit any testimony during the evidentiary hearing from his trial counsel regarding why counsel waived the opening statement. In addition, Miller's argument on appeal consists of a single statement, conclusorily alleging that counsel performed ineffectively by waiving opening statements. Accordingly, this argument was insufficiently presented, and is therefore waived. See Wyatt v. State, 71 So. 3d 86, 111 n.19 (Fla. 2011).

## Standard Jury Instruction

Lastly, Miller contends that the standard penalty phase jury instructions improperly shifted the burden to him to establish that life is the appropriate sentence. This Court has held that claims challenging the constitutionality of Florida's standard jury instructions should be raised during trial and on direct appeal. See, e.g., Rodriguez v. State, 919 So. 2d 1252, 1280 (Fla. 2005) ("Claims regarding the adequacy or constitutionality of jury instructions should be raised on direct appeal."). Miller did not present his jury instruction challenge on direct appeal, and therefore this claim is procedurally barred. Moreover, this Court has repeatedly rejected claims that the Florida standard jury instruction impermissibly shifts the burden to the defense to prove that death is not the appropriate sentence. See, e.g., Jones v. State, 998 So. 2d 573, 589 (Fla. 2008).

## Future Incompetency

In the next three claims, Miller presents similar allegations contending that his diminishing mental functioning due to behavioral variant frontotemporal dementia will eventually render him incompetent. Relying upon the United States Supreme Court's holdings in Atkins v. Virginia, 536 U.S. 304 (2002), and Roper v. Simmons, 543 U.S. 556 (2005), Miller claims that his impending incompetency will place him into a class of individuals who are categorically excluded from

execution.  Accordingly, he requests that this Court vacate his current sentence of death because it serves no legitimate purpose.

This claim is not ripe for review because Miller is currently competent and a death warrant has not been issued for his execution.  Further, we have repeatedly and consistently rejected similar claims.  See, e.g., Johnston v. State, 27 So. 3d 11, 26-27 (Fla. 2010).  In Lawrence v. State, we also rejected a claim virtually identical to that presented by Miller—that defendants with mental illness must be treated similarly to those with mental retardation because both conditions result in reduced culpability.  969 So. 2d 294, 300 n.9 (Fla. 2007).  Accordingly, we deny relief on Miller's claim at this time that his mental illness is a bar to execution.

**HABEAS CORPUS**

In his two habeas claims, Miller presents substantially similar allegations to those presented in his postconviction motion and already rejected by this Court. Miller's habeas petition reargues substantive claims in which he asserts that his mental illness categorically precludes him from execution.  Petitions for habeas corpus relief may not be used as a second appeal for substantive issues that have already been raised or that are procedurally barred.  See Valentine v. State, 98 So. 3d 44, 58 (Fla. 2012).  These claim are meritless for the reasons stated above. Accordingly, we deny habeas relief.

**CONCLUSION**

Based on the foregoing, we affirm the postconviction court's order denying postconviction relief on all claims. We also deny the petition for writ of habeas corpus.

It is so ordered.

LABARGA, C.J., and LEWIS, QUINCE, and PERRY, JJ., concur.
PARIENTE, CANADY, and POLSTON, JJ., concur in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Two Cases:

An Appeal from the Circuit Court in and for Orange County,
       Belvin Perry, Jr., Judge - Case No. 482006CF005222000AOX
And an Original Proceeding – Habeas Corpus

James Vincent Viggiano, Jr., Capital Collateral Regional Counsel, Middle Region, Tampa, Florida, and James Lawrence Driscoll, Jr., Assistant-Capital Collateral Regional Counsel, Middle Region, Tampa, Florida, and David Dixon Hendry, Assistant-Capital Collateral Regional Counsel, Middle Region, Tampa, Florida,

       for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Lisa-Marie Krause Lerner, Assistant Attorney General, West Palm Beach, Florida,

       for Appellee/Respondent